[No. E013126. Fourth Dist., Div. Two. July 18, 1995.]

RITA GENTRY, Plaintiff and Appellant, v.
CITY OF MURRIETA et al., Defendants and Respondents;
McMILLIN COMMUNITIES, Real Party in Interest and Respondent.

COUNSEL

Rita Gentry, in pro. per., for Plaintiff and Appellant.

Weissburg & Aronson, Gregory V. Moser and Steven J. Simerlein for Defendants and Respondents and for Real Party in Interest and Respondent.

OPINION

RICHLI, J.—Appellant Rita Gentry (Gentry) raises virtually every conceivable objection under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] to the approval by respondent City of Murrieta (City) of a plan of respondent McMillin Communities (McMillin) to build 198 homes. The City found that the project, as mitigated, would have no significant environmental effects; as a result, it adopted a mitigated negative declaration and approved the project. The trial court rejected Gentry's objections.

We, too, reject the vast bulk of Gentry's objections and contentions. However, we agree with her that: (1) the City failed to comply with the requirement that it send a copy of its proposed negative declaration to one other public agency (not many other agencies, as Gentry claims); (2) the City imposed one mitigation condition (not many, as Gentry claims) which improperly deferred formulation of specific mitigation measures into the future; (3) the City improperly added certain mitigation conditions (but not as many as Gentry claims) after it released the proposed negative declaration for public review; (4) the trial court applied an incorrect standard of review; and (5) under the correct standard of review, there was substantial evidence to support a fair argument that the project would have certain significant adverse environmental effects (but, again, not as many as Gentry claims). Accordingly, we reverse and we direct the trial court to void the City's adoption of the negative declaration and approval of the project.

I.

FACTUAL AND PROCEDURAL BACKGROUND

Prior to 1988, McMillin's predecessor in interest applied to the County of Riverside (County) for approval of a vesting tentative subdivision map for a project consisting of approximately 555 single-family homes near Murrieta

---

[1] All further statutory references are to the Public Resources Code, unless otherwise specified.

Hot Springs, to be called Adobe Springs. In or about September 1988, in connection with Adobe Springs, the County prepared and certified an environmental impact report (EIR) (Adobe I EIR).

Meanwhile, the County was considering amending its comprehensive general plan (General Plan) by adopting the Southwest Area Community Plan (Community Plan), which would apply to, among other places, the Murrieta area. In March 1989, the County prepared and certified an EIR for the Community Plan (Plan EIR). On November 28, 1989, the County adopted the Community Plan. The Community Plan incorporated the Plan EIR by reference.

In February 1990, McMillin applied to the County for approval of a vesting tentative subdivision map for a 230-home project (later reduced to 198 homes) adjacent to Adobe Springs, to be called Adobe Springs II. Also in February 1990, McMillin applied for a zoning change for Adobe Springs II. The County and, later, the City treated these two applications interchangeably as a single "project" for CEQA purposes. We will follow their lead and refer to the two applications, collectively, as "the Project."

As part of an initial study of the Project, the County considered reports prepared by or for McMillin's predecessor in interest, including a general biological report, a biological report focused on the California gnatcatcher, a traffic report, a slope stability report, and an archeological report. The County solicited and received comments from other county departments, federal, state, and local agencies and other interested parties. The County also received unsolicited comments from Gentry, acting as representative of the Los Alamos Neighborhood Association.

On January 3, 1991, the County Planning Department staff completed an environmental assessment of the Project, Environmental Assessment No. 34807 (EA No. 34807). EA No. 34807 found that the Project as originally proposed would have a number of adverse environmental effects, including effects on traffic, water and sewer systems, recreational facilities, slopes, erosion, floodplains, and wildlife and vegetation. It also found, however, that each of these effects would be mitigated by measures prescribed by various public agencies, or, in the case of wildlife and vegetation, measures prescribed by the biological reports. It concluded that "although the proposed project could have a significant effect on the environment, there will not be a significant effect in this case because the mitigation measures described . . . have been or will be incorporated into the project." Thus, it attached a proposed negative declaration.

On February 13, 1991, the County gave notice of its intent to adopt the negative declaration, and set a public hearing. A County Planning Department staff report dated February 20, 1991 concluded that the Project was

consistent with both the General Plan and the Community Plan, and would have no significant effects on the environment. Thus, it recommended adoption of the negative declaration and approval of the Project. County Planning Department staff also prepared a list of conditions of approval of the Project, numbered 1 through 32. Many of these were environmental mitigation conditions.

The County Planning Commission held public hearings regarding approval of the Project and the proposed negative declaration on March 6, 1991, April 10, 1991, and May 1, 1991. Gentry submitted written materials to the County and appeared at these hearings; she argued in favor of either additional mitigation measures, or the preparation of an EIR.

On May 1, 1991, at the conclusion of the public hearings, the County Planning Commission unanimously recommended to the County Board of Supervisors that it adopt the negative declaration and approve the Project. On June 11, 1991, however, McMillin asked the County to send the administrative record on the Project to the City, which was about to be incorporated and which would have jurisdiction over the Project. Accordingly, on June 18, 1991, the County deferred further consideration of the Project to the City.

The City was incorporated on July 1, 1991. Also on July 1, 1991, the City temporarily adopted all County ordinances, with the exception of the County's General Plan. On October 22, 1991, the City adopted specified County ordinances permanently, again not including the County's General Plan.

On January 9, 1992, McMillin submitted a planning application to the City in connection with the Project. On March 17, 1992, the City gave notice of its intent to adopt a negative declaration regarding the Project, and set a public hearing.

On April 3, 1992, the City released a City Planning Department staff report on the Project.[2] The report incorporated the County's staff report. It recommended that two of the County's conditions of approval be modified, and one new condition added; subject thereto, the report recommended adoption of a negative declaration and approval of the Project.

On April 7, 1992, the City held a public hearing on the Project. Gentry again submitted written materials, appeared at the hearing, and argued in favor of preparation of an EIR.

---

[2]Respondents mistakenly assert that the report was not issued until after the public hearing on April 7, 1992.

The April 7 public hearing was continued to May 5, 1992. In the interim, in response to comments at the April 7 hearing, McMillin procured supplemental reports on storm water drainage, groundwater recharge, and groundwater pollution. Two of these were dated April 22, 1992; the third was dated April 27, 1992. Gentry claims that one of the reports was released on May 1, 1992, but that the other two were not given to the City until the continued public hearing on May 5, 1992 at which the Project was approved. This finds some support in the record.

On May 5, 1992, the City released a second City Planning Department staff report, responding to issues raised at the April 7 public hearing.[3] The report included a revised list of proposed conditions of approval numbered 1 through 128, together with a proposed mitigation monitoring program. Subject to these conditions, it again recommended adoption of a negative declaration and approval of the Project.

At the continued public hearing on May 5, 1992, one of the City staff's proposed conditions of approval was modified and one new condition was added. McMillin accepted all the proposed conditions. Gentry again submitted written materials, appeared at the hearing, and spoke in favor of additional mitigation measures.

At the conclusion of the hearing, the City Council unanimously approved the negative declaration, the mitigation monitoring program, and McMillin's application for subdivision map approval. The City Council found that: (1) the Project was consistent with existing zoning and land uses, and with all applicable state laws, local ordinances, and City policies; (2) there was a reasonable probability that the Project would be consistent with the City's proposed general plan; (3) even if the Project proved to be inconsistent with the City's eventual general plan, there was little or no probability of substantial detriment to or interference with the general plan; (4) environmental concerns had been or would be mitigated by conditions of approval; and (5) the Project as mitigated was not likely to have substantial adverse environmental effects. On May 19, 1992, the City Council approved McMillin's application for a zoning change.

On September 2, 1992, Gentry filed a petition for peremptory writ of mandate and complaint for injunctive relief. On January 29, 1993, the trial court held a hearing on the petition. Following the hearing, it took the matter under submission. The parties then submitted further briefing.

On May 12, 1993, the trial court denied Gentry's petition, finding, among other things, that: (1) the City proceeded pursuant to section 21083.3, which

---

[3]Gentry asserts that the report was released on May 1, 1992. However, she stipulated below that it was released on May 5.

applies when a proposed residential development project is consistent with a general plan for which an EIR has been certified; (2) the applicable standard of review was that set forth in *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249 [232 Cal.Rptr. 772]; and (3) the City's determination that the Project would not have a substantial adverse effect on the environment was supported by substantial evidence. However, the trial court also noted that if section 21083.3 had not applied, "then a negative declaration would not have been appropriate." On May 20, 1993, the trial court entered a judgment denying the petition. On July 19, 1993, Gentry filed a timely notice of appeal.

## II.

### OUTLINE OF CEQA

A. *The Environmental Review Process.*

CEQA generally requires a state or local public agency to prepare an EIR on any activity it undertakes or approves which may have a significant effect on the environment.

CEQA lays out a three-stage process. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66]; Cal. Code Regs., tit. 14, § 15002, subd. (k).)[4] First, the agency must determine whether the particular activity is covered by CEQA. (Guidelines, § 15002, subd. (k)(1).) CEQA applies to any activity which is a "project," and which is not exempt. Generally speaking, any activity a public agency has discretion to carry out or to approve which has the potential for resulting in a physical change in the environment is a "project." (§§ 21065, 21080, subd. (a); Guidelines, §§ 15002, subds. (b), (c), (i), 15378, subd. (a).) Some "projects," however, are statutorily exempt. (E.g., §§ 21080, subd. (b), 21080.01-21080.03,

---

[4]The Secretary of the Resources Agency, pursuant to statutory authority (§ 21083), has promulgated "Guidelines for Implementation of the California Environmental Quality Act." (Cal. Code Regs., tit. 14, § 15000 et seq. [cited hereafter as Guidelines].) The Guidelines purport to be binding on all public agencies. (Guidelines, §§ 15000, 15020.) Although the Supreme Court has repeatedly refused to decide "whether the Guidelines are regulatory mandates or merely aids to interpretation," it has held just as repeatedly that " '[a]t a minimum, . . . courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA.' " (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112, 1123, fn. 4 [26 Cal.Rptr.2d 231, 864 P.2d 502]; *Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564, fn. 3 [276 Cal.Rptr. 410, 801 P.2d 1161]; *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278].)

Respondents have not challenged the validity of any of the Guidelines. Thus, for purposes of this opinion we afford each of the Guidelines cited the "great weight" to which it is presumptively entitled.

21080.05, 21080.07-21080.08, 21080.7-21080.11, 21080.13, 21080.17-21080.19, 21080.21-21080.22; Guidelines, §§ 15260-15277, 15378, subd. (b).) In addition, if the Secretary of the Resources Agency finds that a class of projects will have no significant effect on the environment, he or she may declare such projects categorically exempt. (§ 21084, subd. (a); Guidelines, §§ 15300-15329, 15354.)

Second, the agency must determine whether the project may have significant environmental effects. (Guidelines, § 15002, subd. (k)(2).) Except when the project clearly *will* have such effects, the agency must conduct an initial study to assist it in making this determination. (Guidelines, §§ 15063, subds. (a), (c)(1), 15365.) During the initial study, the agency must consult with certain other interested public agencies. (§ 21080.3, subd. (a); Guidelines, § 15063, subd. (g).)

Based on the initial study, the agency may find no substantial evidence that the project may have a significant effect on the environment. In that case, in lieu of an EIR, it may adopt a statement that the project will have no significant environmental effect. Such a statement is called a negative declaration. (§§ 21064, 21080, subd. (c); Guidelines, §§ 15063, subd. (b)(2), 15064, subd. (g)(2), 15070, subd. (a), 15371.)

Similarly, the agency may find that, although the project as originally proposed might have had potentially significant environmental effects, the project has been modified by measures which mitigate these environmental effects, and there is no substantial evidence that the project, as modified, may have a significant effect on the environment. In that case, in lieu of an EIR, the agency may adopt a "mitigated" negative declaration. (Guidelines, § 15070, subd. (b).)

Before an agency adopts either a negative declaration or a mitigated negative declaration, however, it must give public notice of its intent to do so. (§ 21092; Guidelines, § 15072.) It must make the proposed negative declaration available to the public and to certain other interested public agencies for a specified period for review and comment. (Guidelines, § 15073.) It then must consider the comments it receives in determining whether to adopt a negative declaration. (Guidelines, § 15074, subd. (b).)

If the administrative record before the agency contains substantial evidence that the project may have a significant effect on the environment, it cannot adopt a negative declaration; it must go to on the third stage of the CEQA process: preparation and certification of an EIR. (§§ 21100, 21151; Guidelines, §§ 15002, subd. (k)(3), 15063, subd. (b)(1), 15064, subds. (a)(1), (g)(1), 15362.)

The EIR is the "heart" of CEQA. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra*, 6 Cal.4th at p. 1123; *No Oil, Inc.* v. *City of Los Angeles, supra*, 13 Cal.3d at p. 84; Guidelines, § 15003, subd. (a).) It is a vehicle for identifying, analyzing, disclosing, and, to the extent possible, avoiding a project's significant environmental effects. (§§ 21002.1, subd. (a), 21061; Guidelines, § 15002, subds. (a), (f).) However, an agency may undertake or approve a project even though the EIR indicates that it will have significant environmental effects, provided the agency finds that the expected benefits of the project outweigh its environmental effects, and that further mitigation of these effects is not feasible. (§§ 21002, 21002.1, subds. (b), (c), 21081; Guidelines, §§ 15043, §§ 15091, 15092, subd. (a), 15093, subd. (a).)

B. *"Piggy-Backing" Provisions for Basing an Environmental Review on a Previous Environmental Review.*

Once a negative declaration has been adopted or an EIR has been certified for a project, this three-stage process is technically at an end. When new activities may come up for approval, however, they may be related to the original project in such a way that repeating the entire three-stage process would be wasteful. CEQA therefore affords a variety of mechanisms for "piggy-backing" environmental review of successive approvals.

First, if the new activity can be deemed a change to the original project, the agency may limit its environmental review to the question of whether to require a subsequent or supplemental EIR (SEIR). Generally, once an EIR has been prepared, a public agency cannot require the preparation of an SEIR unless either: "(a) Substantial changes are proposed in the project which will require major revisions of the [EIR]. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the [EIR]. [¶] (c) New information, which was not known and could not have been known at the time the [EIR] was certified as complete, becomes available." (§ 21166; see also Guidelines, § 15162.) A change is "substantial" and "require[s] major revisions" in a previous EIR only if it involves new significant environmental impacts that were not considered in the previous EIR. (Guidelines, § 15162, subds. (a)(1), (a)(2).) Thus, an SEIR may be required with respect to a new activity if it constitutes a substantial change in the original project,

and if it involves significant environmental effects not considered in the original EIR.[5]

Second, if the new activity is not deemed a mere change in the original project, the agency may still limit its environmental review of the new activity by "tiering." " 'Tiering' refers to the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs or ultimately site-specific EIRs incorporating by reference the general discussions and concentrating solely on the issues specific to the EIR subsequently prepared." (Guidelines, § 15385; see also §§ 21068.5, 21093, 21094; Guidelines, §§ 15152, 15168.)

Finally, in various special situations, CEQA offers partial or conditional exemptions which operate much like "piggy-backing." One such partial exemption applies to a residential development project that is consistent with a general plan for which an EIR has been certified. (Former § 21083.3, subd. (a), amended eff. Jan. 1, 1993, now § 21083.3, subd. (b); see Guidelines, § 15183, subd. (b).) The application of CEQA to such a project is "limited to effects on the environment which are peculiar to the parcel or to the project and which were not addressed as significant effects in the prior [EIR]." (Former § 21083.3, subd. (a), amended eff. Jan. 1, 1993, now § 21083.3, subd. (b); see Guidelines, § 15183, subd. (a).)[6]

## C. *Judicial Review.*

"In an action to set aside an agency's determination under [CEQA], the appropriate standard of review is determined by the nature of the proceeding below. . . . [S]ection 21168 'establishes the standard of review in administrative mandamus proceedings' under Code of Civil Procedure section

[5]Except as otherwise indicated, we refer to CEQA and the Guidelines as they stood during the events below. Recently, however, a number of the Guidelines were amended, operative September 19, 1994.

Guidelines, section 15162 has been amended to provide, among other things, that an SEIR may be required if a change involves *either* new significant environmental effects, *or* "a substantial increase in the severity of previously identified significant effects." (Guidelines, § 15162, subd. (a)(1) and (a)(2), Register 94, No. 34, operative Sept. 19, 1994.)

[6]Another conditional exemption is very similar to section 21083.3. It applies to a residential development plan that is consistent with a *specific* plan for which an EIR has been certified. (Gov. Code, § 65457; Guidelines, § 15182.) Such a residential development plan is exempt from CEQA. However, if there has been any substantial change to the specific plan, any substantial change in the circumstances surrounding the specific plan, or any new information, such that an SEIR is required with respect to the specific plan, the exemption does not apply unless and until the necessary SEIR has been prepared and certified. (Gov. Code, § 65457, subd. (a); Guidelines, § 15182, subd. (c).)

Neither of the parties has cited, discussed, or relied on this exemption, and we therefore do not consider its applicability to this case.

1094.5 while section 21168.5 'governs traditional mandamus actions' under Code of Civil Procedure section 1085. [Citation.] The former section applies to proceedings normally termed 'quasi-adjudicative,' 'in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency . . . .' [Citations.] The latter section applies to all other actions taken pursuant to CEQA and generally encompasses 'quasi-legislative' decisions made by a public agency. [Citations.]" (*Sierra Club* v. *Gilroy City Council* (1990) 222 Cal.App.3d 30, 38-39 [271 Cal.Rptr. 393], fn. omitted, disapproved on other grounds in *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 570, fn. 2, 576, fn. 6 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; see also *Western States Petroleum Assn.* v. *Superior Court, supra,* 9 Cal.4th at pp. 559, 566-568; 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1993) [cited hereafter as Kostka & Zischke] § 23.32, pp. 947-948; Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (8th ed. 1994) [cited hereafter as Remy] at pp. 290-292; Selmi, *The Judicial Development of the California Environmental Quality Act* (1984) 18 U.C. Davis L.Rev. 197, 221-222.)

The distinction, however, is rarely significant. In either case, the issue before the trial court is whether the agency abused its discretion. Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence. (*Sierra Club* v. *Gilroy City Council, supra,* 222 Cal.App.3d at pp. 39-40; *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency, supra,* 188 Cal.App.3d at p. 260; 2 Kostka & Zischke, *supra,* §§ 23.33-23.35, pp. 948-949; Remy, *supra,* at p. 292.)

"[I]n undertaking judicial review pursuant to Sections 21168 and 21168.5, courts shall continue to follow the established principle that there is no presumption that error is prejudicial." (§ 21005, subd. (b).) However, "noncompliance with the information disclosure provisions of [CEQA] which precludes relevant information from being presented to the public agency, or noncompliance with substantive requirements of [CEQA], may constitute a prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied with those provisions." (§ 21005, subd. (a).)

On appeal, the appellate court's "task . . . is the same as that of the trial court: that is, to review the agency's actions to determine whether the agency complied with procedures required by law." (*Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 738 [22 Cal.Rptr.2d 618].) The appellate court reviews the administrative record

independently; the trial court's conclusions are not binding on it. (*Schaeffer Land Trust* v. *San Jose City Council* (1989) 215 Cal.App.3d 612, 622 [263 Cal.Rptr. 813]; *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency, supra,* 188 Cal.App.3d at p. 260; *City of South Gate* v. *Los Angeles Unified School Dist.* (1986) 184 Cal.App.3d 1416, 1422 [229 Cal.Rptr. 568]; *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 239 [227 Cal.Rptr. 899]; 2 Kostka & Zischke, *supra,* § 23.140, at p. 1043.)

III.

PROCEDURAL COMPLIANCE WITH CEQA: THE INITIAL STUDY

Gentry contends that the initial study was defective because (1) it did not provide evidence for its conclusions that the Project would have no significant impacts on scenic resources, historic resources, and water resources, and no cumulative impacts, (2) it did not discuss specific mitigation measures, and (3) it did not examine the Project's consistency with existing zoning, plans, and policies.

The initial study is largely a creature of the Guidelines (see discussion to Guidelines, § 15063); CEQA refers to it only glancingly (e.g., § 21080, subd. (c)(2)). The Guidelines require the lead agency to "conduct an Initial Study to determine if the project may have a significant effect on the environment." (Guidelines, § 15063, subd. (a).) The initial study must include, among other things, a description of the project (Guidelines, § 15063, subd. (d)(1)); an identification of its environmental effects "by use of a checklist, matrix, or other method" (Guidelines, § 15063, subd. (d)(3)); "[a] discussion of ways to mitigate the significant effects identified, if any" (Guidelines, § 15063, subd. (d)(4)); and "[a]n examination of whether the project would be consistent with existing zoning, plans, and other applicable land use controls." (Guidelines, § 15063, subd. (d)(5).) The Guidelines include a sample initial study, which uses a checklist format. (Guidelines, § 15063, subd. (f) and appens. H & I.) The sample is merely suggested, however, not mandatory; ". . . public agencies are free to devise their own format for an Initial Study." (Guidelines, § 15063, subd. (f); see also Guidelines, appen. I.)

Here, the initial study was prepared by Alex Gann and John Lampe of the County Planning Department. They identified potentially significant effects primarily by sending information about the Project to interested local, state

and federal public agencies and other entities, and soliciting their responses.[7] They also relied on various studies and reports.[8] Lampe then recorded their findings in EA No. 34807.

EA No. 34807 consisted of a checklist of possible environmental effects followed by a narrative section in which to link each effect to particular information sources, agencies consulted, findings of fact, and recommended mitigation measures. According to the checklist, the Project as proposed would have effects on, among other things, traffic, water and sewer systems, recreational facilities, slopes, erosion, floodplains, wildlife, and vegetation. It would have no effect on scenic resources, historic resources, or water resources, and no cumulatively significant effects.

The narrative section listed the studies and reports relied upon, but did not specifically list the agencies or entities consulted or the responses received from them. It then indicated briefly why each potential environmental effect did not require an EIR. In most instances, it indicated that the effect would be mitigated by measures prescribed by a specified public agency, or in a specified report. For example, it stated that "[f]lood hazards shall be mitigated through the requirements imposed by Riverside County Flood Control and Conservation District." It did not further specify any particular mitigation measures.

## A. *Evidence for the Initial Study's Conclusions.*

Gentry contends that the initial study was defective because it provided no evidence for its conclusions that the Project would have no significant impacts on scenic resources, historic resources, and water resources, and no cumulative impacts.

---

[7]During an initial study, the lead agency must consult informally with all "responsible agencies"—public agencies with discretionary approval power over the project—and with all "trustee agencies"—public agencies with jurisdiction over any natural resources held in trust for the People of California that would be affected by the project. (§ 21080.3, subd. (a); Guidelines, § 15063, subd. (g); see also Guidelines, §§ 15381, 15386.)

Gentry does not contend that the County or the City failed in its duty to consult with other public agencies during the initial study period. She contends only that *after* the initial study period, the City failed to send a copy of the proposed negative declaration to other public agencies. (See part IV.B., *post.*) Thus, we have no occasion to decide whether there was adequate consultation.

[8]Respondents contend that the County's initial study also relied on the Plan EIR. This contention is not supported by the record. EA No. 34807 merely noted that the Project was within the Community Plan area, that the Community Plan designated it for a density of two to four dwelling units per acre, and that the Project was "consistent with the land use designations and policies" of the General Plan. With the exception of the initial study's analysis of traffic effects, which we will discuss in part VI.B.1., *post*, there is no indication that EA No. 34807 made use of any environmental information or analysis from the Plan EIR.

One of the purposes of an initial study is to "[p]rovide documentation of the factual basis for the finding in a Negative Declaration that a project will not have a significant effect on the environment." (Guidelines, § 15063, subd. (c)(5).) A negative declaration must include not only "a proposed finding that the project will not have a significant effect on the environment," but also a "copy of the Initial Study documenting reasons to support the finding." (Guidelines, § 15071, subds. (c) and (d).) Accordingly, "[a]n initial study leading to a negative declaration should provide the basis for concluding that the project will not have a significant effect on the environment." (*Leonoff* v. *Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1347 [272 Cal.Rptr. 372].)

In *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893], we struck down two negative declarations on grounds unrelated to the adequacy of the initial studies. We also held, however, that on remand, the evidence supporting the initial studies should be disclosed. (*Id.*, at p. 172.) We noted that in an administrative mandamus proceeding, the court must determine whether the respondent's findings were supported by the evidence. (*Id.*, at p. 171.) "Therefore, although an initial study can identify environmental effects by use of a checklist [citation], it must also disclose the data or evidence upon which the person(s) conducting the study relied. Mere conclusions simply provide no vehicle for judicial review." (*Ibid.*)

■ Gentry essentially contends that under *Citizens*, an initial study must disclose sufficient evidence to support each and every one of its findings. We disagree. In *Citizens*, we required an initial study to disclose the evidence upon which it is based in order to afford a basis for judicial review. However, we did not hold that the failure of an initial study to disclose the evidence supporting particular findings would necessarily be fatal to the resulting negative declaration. There is "no authority . . . that an initial study is inadequate unless it amounts to a full-blown EIR based on expert studies of all potential environmental impacts. If this were true, the Legislature would not have provided in CEQA for negative declarations." (*Leonoff* v. *Monterey County Bd. of Supervisors, supra*, 222 Cal.App.3d at p. 1347.)[9]

"The agency [will] not be allowed to hide behind its own failure to gather relevant data. . . . CEQA places the burden of environmental investigation

---

[9]Recently, section 15063 of the Guidelines was amended to require that where an initial study is in checklist form, entries on the checklist must be "briefly explained to indicate that there is some evidence to support" them. (Guidelines, § 15063, subd. (d)(3), Register 94, No. 34, operative Sept. 19, 1994.) As this provision was not in effect when the initial study here was prepared, we are not called upon to determine whether failure to comply with it would invalidate an ensuing negative declaration.

on government rather than the public. If the local agency has failed to study an area of possible environmental impact, a fair argument may be based on the limited facts in the record. Deficiencies in the record may actually enlarge the scope of fair argument by lending a logical plausibility to a wider range of inferences." (*Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296, 311 [248 Cal.Rptr. 352]; see also *Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180, 197 [228 Cal.Rptr. 868] [fact that initial study checklist was incomplete and marked every impact "no" supported fair argument that project would have significant environmental effects].)

However, the ultimate issue is not the validity of the initial study, but rather the validity of the lead agency's adoption of a negative declaration. Even if the initial study fails to cite evidentiary support for its findings, "it remains the appellant's burden to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact." (*Leonoff* v. *Monterey County Bd. of Supervisors*, *supra*, 222 Cal.App.3d at pp. 1348-1349.) "An absence of evidence in the record on a particular issue does not automatically invalidate a negative declaration. 'The lack of study is hardly evidence that there *will* be a significant impact.'" (1 Kostka & Zischke, *supra*, § 6.75, at p. 316, italics added, quoting *Leonoff* v. *Monterey County Bd. of Supervisors*, *supra*, 222 Cal.App.3d at p. 1354.)

An agency's adoption of a negative declaration may be based on the initial study "together with any comments received during the public review process." (Guidelines, § 15074, subd. (b).) Thus, "where the agency decision is based on more information than the initial study, the additional information may cure any defects in the initial study." (*Leonoff* v. *Monterey County Bd. of Supervisors*, *supra*, 222 Cal.App.3d at pp. 1347-1348; see also *Sundstrom* v. *County of Mendocino*, *supra*, 202 Cal.App.3d at p. 305 ["Even if the initial study is defective, the record may be extensive enough to sustain the agency's action."].)

■ EA No. 34807 does not cite any evidence supporting its conclusions that the Project would not adversely affect either scenic or historic resources.[10] In addition, it does not appear that the County Planning Department relied on any relevant studies or reports, or consulted with any agencies or

---

[10]Respondents do not cite *any* evidence in the record to support *any* of the conclusions in EA No. 34807. Instead, they blithely assert that "[t]he inferential links between evidence and conclusions are apparent to anyone who examines the initial study." Despite this tempting invitation to apply the rule that "allegations by the parties which are not supported by appropriate reference to the record will be disregarded" (*Millan* v. *Restaurant Enterprises Group, Inc.* (1993) 14 Cal.App.4th 477, 485 [18 Cal.Rptr.2d 198]), we have independently

entities with expertise on these subjects. Sometimes, however, expert planning personnel may be entitled to conclude without additional evidence or consultation that a project will not have a particular environmental impact. (*Leonoff* v. *Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1354 [given project's urban setting, "it does not seem unreasonable to conclude" that it would have no significant noise or odor impacts]; 1 Kostka & Zischke, *supra,* § 6.20, pp. 267-268.) Here, the County Planning Department could reasonably find, based on its experience and its review of the Project, that the Project would not impact scenic or historic resources.[11] The initial study is not defective merely because it fails to disclose evidence supporting these two particular findings.

Even assuming, however, that the initial study was defective in this respect, we believe the defect was remedied in the course of public hearings on the Project. Both the County and the City had to give notice to residents in the vicinity of the Project (Guidelines, § 15072, subd. (a)(2) and (a)(3)), and many attended the public hearings. Residents' observations, based on personal knowledge, may constitute substantial evidence that a project will have a particular environmental effect. (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d at p. 173.) Nevertheless, no substantial evidence was ever offered to support a fair argument that the Project might adversely affect scenic resources. Even Gentry, who has pointed out every remotely challengeable aspect of the Project, does not contend otherwise. This lack of comment, like Sherlock Holmes's "dog in the night-time" which tellingly failed to bark (2 Doyle, *Silver Blaze,* in The Annotated Sherlock Holmes (Baring-Gould ed. 1967) pp. 277, 280), was in itself evidence. As we hold in part VI.B.3., *post,* no substantial evidence was ever offered to support a fair argument that the Project might adversely affect historic resources. Under the circumstances, the City could properly conclude that the Project would not affect either scenic or historic resources.

■ The initial study likewise does not cite any evidence supporting its conclusion that the Project would not adversely affect groundwater quantity or quality. The administrative record, however, sheds considerable light on this question. During the initial study period, the County solicited comments

---

reviewed the record to determine whether these links are indeed as apparent as respondents assert.

[11]Gentry contends that EA No. 34807's conclusion that the Project would have no effect on historic resources is defective because, she asserts, it "cited the Riverside County General Plan as a basis for [this] conclusion . . . . Yet, that document did not have a complete and up-to-date inventory of these resources . . . ." This assertion lacks a citation to the record, and we have been unable to substantiate it. The General Plan is not in the record. EA No. 34807 itself is in the record, but we find no such reference in it.

from the Eastern Municipal Water District, which would have jurisdiction over the provision of water and sewer service to the Project; from the County Flood Control and Water Conservation District, which had jurisdiction over groundwater recharge in the area of the Project (Wat. Code, appen. § 48-9); and from the County Health Department. These agencies responded by proposing conditions to mitigate the Project's effects on water resources. Their proposed conditions were incorporated in the County's conditions of approval, and, later, in the City's. The record thus amply reveals the evidence on which the County Planning Department relied in concluding that the Project, as mitigated, would not adversely affect groundwater quantity or quality.

Again, however, even assuming that the initial study was defective in this respect, the defect was remedied by the additional groundwater reports which McMillin submitted to the City before it adopted the negative declaration. These reports concluded that the Project would neither pollute groundwater nor prevent groundwater recharge.

Finally, Gentry also contends that the initial study provided no evidence for its conclusion that the Project would have no cumulative impacts. ▮ A project's environmental effects may be sufficiently significant to require the preparation of an EIR if they are "cumulatively considerable," meaning that "the incremental effects of [the] individual project are considerable when viewed in connection with effects of past projects, the effects of other current projects, and the effects of probable future projects." (Guidelines, § 15065, subd. (c).) This requires the lead agency to "consider[] the effects of other projects, but only as a context for considering whether the incremental effects of the project at issue are considerable. In other words, the agency determines whether the incremental impacts of the project are 'cumulatively considerable' by evaluating them against the backdrop of the environmental effects of other projects." (1 Kostka & Zischke, *supra*, § 6.55, at p. 299.)

EA No. 34807 expressly relied on the traffic report, which in turn expressly considered the Project's traffic impacts together with those of other projects planned in the area. Other than as to traffic, however, the initial study does' not indicate any evidence relied upon to support its conclusion that the Project would have no cumulative impacts. Moreover, neither the County nor the City seems to have performed any analysis or received any evidence that would support such a conclusion. The County could not presume that the other agencies and entities it consulted would alert it to any cumulative impacts, because it does not appear to have furnished them with the necessary information about other projects in the

vicinity. Moreover, the cumulative impacts of a project will not usually be apparent without study, even to expert planning personnel, much less to local residents.

This lack of study, standing alone, does not give rise to a fair argument that the Project will in fact have significant cumulative effects. (*Leonoff* v. *Monterey County Bd. of Supervisors, supra*, 222 Cal.App.3d at p. 1358 [lack of cumulative effects analysis in initial study did not invalidate negative declaration where there was no substantial evidence that project itself would have any individually significant effect].) However, it does "enlarge the scope" of the fair argument which may be made "based on the limited facts in the record." (*Sundstrom* v. *County of Mendocino, supra*, 202 Cal.App.3d at p. 311.)

As we will discuss in part VI.A., *post*, there was substantial evidence in the record to support a fair argument that the Project would have significant adverse effects on wildlife, particularly the Stephens' kangaroo rat. The lack of evidence in the record to support a conclusion that the Project would have *no* cumulative effects thus tends to support a fair argument that, at least as to wildlife, the Project *will* have such effects.

B. *Discussion of Mitigation in the Initial Study.*

Gentry contends that the initial study violated the requirement that it include "[a] discussion of ways to mitigate the significant effects identified, if any." (Guidelines, § 15063, subd. (d)(4).) She points out, correctly, that EA No. 34807 contained no specific mitigation measures. It merely found that the Project's potentially significant impacts could be mitigated by payment of various specified fees, by compliance with the "requirements" of various specified public agencies, and by "appropriate measures" as stated in specified reports.

We have been able to take most of EA No. 34807's references to particular public agencies and reports and connect them to specific mitigation measures in the administrative record without too much difficulty. Nevertheless, for purposes of this issue, we assume without deciding that the initial study did not adequately incorporate by reference the specific mitigation measures that had been recommended. Even so, we do not believe EA No. 34807 violated the Guidelines.

When a proposed negative declaration is released to the public, it is to be accompanied by *both* a "copy of the Initial Study" (Guidelines, § 15071, subd. (d)) *and* the "[m]itigation measures . . . included in the

project." (Guidelines, § 15071, subd. (e).) Thus, the Guidelines contemplate that the initial study will not necessarily constitute the complete list of all specific mitigation measures. An initial study need only discuss possible avenues of mitigation. EA No. 34807 did discuss "ways to mitigate the significant effects identified," and it therefore complied with this requirement.

C. *The Initial Study's Examination of the Project's Consistency With Existing Land-use Controls.*

Gentry contends that the initial study violated the requirement that it include "[a]n examination of whether the project would be consistent with existing zoning, plans, and other applicable land use controls" (Guidelines, § 15063, subd. (d)(5)) because it failed to examine the Project's consistency with the *City's* land use controls. EA No. 34807 *did* examine whether the Project would be consistent with the *County's* land use controls, including the General Plan and the Community Plan; Gentry does not contend otherwise.

Respondents contend that this discussion was adequate because the City was required to apply the County's land-use controls. They rely on Government Code section 66474.2, subdivision (a), which provides that "in determining whether to approve or disapprove an application for a tentative map, the local agency shall apply only those ordinances, policies, and standards in effect at the date the local agency has determined that the application is complete . . . ." McMillin's application to the County was complete some time in 1990. (See Gov. Code, § 65943, subd. (a).) Respondents conclude that the City had to apply the land use controls in effect in 1990, namely the County's.

This is by no means clear, however. The record indicates that when the City was incorporated, McMillin filed a new application with the City. If so, then arguably the City was bound to apply the land use controls in effect when *that* application was complete.

We prefer to resolve this issue on the ground that the City's land use controls were not significantly different from the County's. When the City was incorporated, it adopted all County ordinances, including the applicable zoning ordinance, with the exception of the County's General Plan. The City did not have to adopt its own general plan until 30 months (or more) after its incorporation. (Gov. Code, §§ 65360, 65361.) At least as of May 5, 1992, when it approved the Project, it had not yet done so. Thus, when the City released its proposed negative declaration, there was no applicable general

plan. Otherwise, however, the City's land use controls were the same as the County's. Accordingly, EA No. 34807's discussion of the Project's consistency with existing land use controls was relevant and applicable even after the City took jurisdiction, except for its discussion of consistency with the County's General Plan, which was surplusage.

██ In any event, the Guidelines contemplate that "only one initial study need be prepared for a project. If a project is modified after the study has been prepared, the [lead] agency need not prepare a second initial study." (1 Kostka & Zischke, *supra*, § 6.15, at p. 263; see also *Uhler* v. *City of Encinitas* (1991) 227 Cal.App.3d 795, 803 [278 Cal.Rptr. 157], disapproved on other grounds in *Quail Botanical Gardens Foundation, Inc.* v. *City of Encinitas* (1994) 29 Cal.App.4th 1597, 1603 [35 Cal.Rptr.2d 470]; Guidelines, §§ 15063, subd. (a), 15070.) We believe this is equally true if the project remains the same, but the identity of the lead agency changes. Thus, the initial study was not deficient because it discussed the Project's consistency with the County's land use controls rather than with the City's.

IV.

PROCEDURAL COMPLIANCE WITH CEQA: THE MITIGATED
NEGATIVE DECLARATION

Gentry contends that the City failed to comply with CEQA procedures for adopting a mitigated negative declaration, in that: (1) the City failed to make the proposed negative declaration itself available for public review, (2) the City failed to send a copy of the proposed negative declaration to trustee agencies, (3) the proposed negative declaration failed to include all of the proposed mitigation measures which the City eventually adopted, (4) certain conditions improperly deferred the determination of appropriate mitigation measures, and (5) the negative declaration did not reflect the City's independent judgment. We address these contentions seriatim.

A. *Failure to Make the Negative Declaration Publicly Available.*

Gentry contends that the City never released the proposed negative declaration itself to the public for review. The lead agency must give public notice of its intent to adopt a negative declaration. (§ 21092, subd. (a); Guidelines, § 15072, subd. (a).) It also must make the proposed negative declaration available for public review, for a specified period; at all times relevant here, this period was at least 21 days. (Former § 21091, subd. (b) (Stats. 1989, ch. 907, § 2), amended eff. Jan. 1, 1994 (Stats. 1993, ch. 1130, § 11); Guidelines, § 15073, subd. (a) and discussion.) A proposed negative

declaration must include the proposed finding that the project will not have any significant environmental effects, a copy of the initial study, and any mitigation measures included in the project. (Guidelines, § 15071.)

The City gave notice of its intent to adopt a negative declaration on March 17, 1992. Preliminarily, Gentry contends that the City's notice did not indicate that the negative declaration was available for review. At the time, a notice of intent to adopt a negative declaration had to "specify . . . the address where copies of the . . . negative declaration are available for review." (Former § 21092, subd. (a) (Stats. 1989, ch. 907, § 3), amended eff. Jan. 1, 1994 (Stats. 1993, ch. 1130, § 12), now § 21092, subd. (b)(1).)[12] The City's notice announced that it was considering the adoption of a negative declaration, and stated where "[t]he environmental finding along with the proposed project application may be reviewed . . . ." Obviously, the "environmental finding" means the negative declaration.

Gentry also claims that the City released EA No. 34807 alone, without any proposed mitigation measures or other supporting documentation. Accordingly, she discusses the adequacy of the negative declaration in terms of whether EA No. 34807, standing alone, was an adequate negative declaration. She cites no evidence in the record to support her claim, however, and we have found none.

■ The City is entitled to the benefit of the presumption that its official duty has been regularly performed. (Evid. Code, § 664.) Thus, we presume that the City released all documents that it was required to release as part of the proposed negative declaration, to the extent that they existed and were part of the administrative record at the time.[13] The administrative record as it then stood included the proposed negative declaration, EA No. 34807, the County's proposed mitigation measures, supporting studies, letters, and other documentation. Taken together, these constituted an adequate negative declaration.

---

[12]A recent amendment to this provision requires the notice to specify the address where the negative declaration *"and all documents referenced in the . . . negative declaration"* are available for review. (§ 21092, subd. (b)(1), italics added.)

[13]In a letter to the City, Gentry critiqued "[EA No.] 34807 *with its initial study and accompanying documents."* (Italics added.) She later admitted that before she wrote that letter, she had reviewed the negative declaration. Obviously, the City released more than just EA No. 34807.

### B. *Failure to Send the Proposed Negative Declaration to Trustee Agencies.*

 Gentry contends that the City failed to send its proposed negative declaration to trustee agencies, as required.[14] Before a lead agency determines whether a negative declaration or an EIR is required for a project, it must consult "with any other public agency which has jurisdiction by law over natural resources affected by the project which are held in trust for the people of the State of California." (§ 21080.3, subd. (a).)

To implement this provision, the Guidelines require the lead agency to send notice of its intent to adopt a negative declaration, together with a copy of a proposed negative declaration, "to every . . . Trustee Agency[15] concerned with the project and every other public agency with jurisdiction by law over resources affected by a project."[16] (Guidelines, § 15073, subd. (b).) Also, if one or more trustee agencies, or public agencies with jurisdiction over resources affected by the project, is a state agency, the Guidelines require the lead agency to send the proposed negative declaration to the State Clearinghouse maintained by the Office of Planning and Research, which distributes it to the state agencies. (Guidelines, § 15073, subd. (c); see also Guidelines, § 15023, subd. (c).)

There is no indication that the County or the City ever sent the proposed negative declaration to any other public agencies. Thus, we must determine whether there were any "trustee agencies" with respect to the Project to which the proposed negative declaration should have been sent. Gentry uses the initial study to identify trustee agencies. She presumes that the City had to send its proposed negative declaration to any public agency with jurisdiction over resources which the initial study found would be affected by the Project, as originally proposed. For example, she notes that EA No. 34807 found that the Project would affect wildlife resources, and contends that the

---

[14]In a supplemental letter brief, respondents contend that Gentry is barred from raising this objection, because she failed to raise it in the proceedings before the City or in the trial court. The fact is, however, that Gentry *did* object to the failure to send the proposed negative declaration to trustee agencies, both in the administrative proceedings and in the trial court. Respondents' claim to the contrary is frivolous.

[15]The Guidelines define "Trustee Agency" as "a state agency having jurisdiction by law over natural resources affected by a project which are held in trust for the people of the State of California." (Guidelines, § 15386.)

[16]We note that the Guideline purports to enlarge the statutory requirement in two respects. First, it requires not just consultation but also notice, and notice in a specified form. Second, it requires such notice to be given not just to trustee agencies—i.e., agencies with jurisdiction by law over natural resources "held in trust for the people of the State of California" that would be affected by the project—but also to agencies with jurisdiction by law over *any* natural resources that would be affected by the project.

proposed negative declaration should have been sent to the United States Fish and Wildlife Service and to the state Department of Fish and Game because they have jurisdiction over wildlife resources. Similarly, she notes that EA No. 34807 found that the Project would affect water erosion, and contends that the proposed negative declaration should have been sent to the Regional Water Quality Control Board because it has jurisdiction over water quality, and supposedly also over water erosion.

The process of identifying potential trustee agencies is distinct from the process of identifying a project's significant effects on the environment. "As soon as a Lead Agency has determined that an Initial Study will be required for the project," it must consult informally with "all Trustee Agencies responsible for resources affected by the project . . . ." (Guidelines, § 15063, subd. (g).) One purpose of the initial study is to determine whether the project will have any significant environmental effects. (Guidelines, § 15063, subd. (c)(1-3, 5).) Thus, the lead agency must identify potential trustee agencies before it knows what the significant environmental effects of the project will be.

Similarly, the lead agency must send the proposed negative declaration to every "[t]rustee [a]gency." (Guidelines, § 15073, subd. (b).) A public agency is a trustee agency only if it has jurisdiction over resources "affected by" a project. (Guidelines, § 15386; see also § 21080.3, subd. (a).) If the lead agency proposes to adopt a negative declaration, however, then by definition it has found that the project will have no significant effects on any resource.

We conclude that natural resources can be "affected by" a project, and hence the lead agency may have duties toward "trustee agencies," even if the lead agency believes the project will have no significant effect on the environment. This broad construction of "trustee agency" serves the statutory purpose of fostering interagency consultation. Potential trustee agencies should have input at an early stage in the process into the question of whether the project affects resources within their jurisdiction, and hence into the very question of whether they are, in fact, trustee agencies. Any difficulty a lead agency faces in identifying potential trustee agencies as a result of this apparent circularity is lessened by the provisions of the Guidelines which list state departments with statutory authority over specified environmental effects (Guidelines, appen. B), which require public agencies to keep their own lists of "other agencies . . . which have jurisdiction by law and/or special expertise with respect to various projects and project locations" (Guidelines, § 15087, subd. (f)), and which permit a lead agency to send environmental documents to state and regional clearinghouses. (Guidelines, § 15087, subd. (d).)

■ We therefore agree with Gentry that, at a minimum, if the initial study finds that a project as originally proposed would have a significant environmental effect on a natural resource, that resource is "affected by" the project. (Cf. Cal. Code Regs., tit. 14, § 753.5, subd. (d).) Thus, the lead agency must send any proposed negative declaration to any public agency with jurisdiction over that resource. We caution that the initial study is not necessarily the *only* basis for finding that a proposed negative declaration must be sent to another public agency. The lead agency may want to consult with other public agencies, and to send them any proposed negative declaration, even if its initial study indicates that the project will *not* affect any resources within their jurisdiction. Such a practice would promote sound, informed decisionmaking. On these facts, however, we need not decide whether CEQA so requires.

■ Here, EA No. 34807 found that the Project, as proposed, would affect wildlife. By law, the Department of Fish and Game holds the fish and wildlife resources of the state in trust for the People of California. (Fish & G. Code, § 711.7, subd. (a).) The Guidelines specifically provide that the Department of Fish and Game is a trustee agency "with regard to the fish and wildlife of the state." (Guidelines, § 15386, subd. (a).) Thus, the City should have sent a copy of its proposed negative declaration to the Department of Fish and Game. Moreover, as this trustee agency is a state agency, the City should also have sent a copy of its proposed negative declaration to the State Clearinghouse. (Guidelines, § 15073, subd. (c).)

As respondents note, the County solicited comments during the initial study period from the Department of Fish and Game, which never responded. This, however, is pertinent, if at all, only to compliance with the requirement that the lead agency consult with trustee agencies during the initial study period. (§ 21080.3, subd. (a); Guidelines, § 15063, subd. (g).) It is no substitute for compliance with the separate requirement that the lead agency send any resulting proposed negative declaration to all trustee agencies.

In a supplemental letter brief, respondents also note that before the notice of determination could be filed, a fee had to be paid to the Department of Fish and Game. (See § 21089, subd. (b); Fish & G. Code, § 711.4.) This fee, however, is paid by the project applicant to the county clerk, which sends the fee and a copy of the notice of determination to the Department of Fish and Game; it does not send a copy of the negative declaration. (Fish & G. Code, § 711.4, subd. (e), (e)(1); Cal. Code Regs., tit. 14, § 753.5, subds. (b)(2), (e)(1), (4) & (8).) In any event, the fee was paid after the City had already adopted the negative declaration; it was too late for the Department of Fish and Game to comment or to object.

Federal agencies, like the United States Fish and Wildlife Service, on the other hand, are not "public agencies" within the meaning of either CEQA or the Guidelines. (§ 21063; Guidelines, § 15379.) A trustee agency is one which has "jurisdiction by law over natural resources . . . which are held in trust for the people of the State of California." (§ 21080.3, subd. (a); Guidelines, § 15386.) Thus, the Guidelines indicate that only a "state agency" can be a trustee agency. (Guidelines, § 15386.) We conclude that the City did not have to send a copy of its proposed negative declaration to the United States Fish and Wildlife Service.

EA No. 34807 also found that the Project, as proposed, would increase water erosion. Although the State Water Quality Control Board and the various regional water quality control boards have statutory jurisdiction over water quality (Wat. Code, § 13001), they have no particular authority over water erosion. Thus, we have no basis for finding that the City was required to send the proposed negative declaration to the Regional Water Quality Control Board.

(9c) In sum, the City abused its discretion by failing to send a copy of its proposed negative declaration to the Department of Fish and Game and to the State Clearinghouse before it adopted the negative declaration. In part VI., *post*, we hold that for other reasons the adoption of the negative declaration cannot stand. Accordingly, we need not decide whether this abuse of discretion was so prejudicial that we would be required to reverse the judgment below on this ground alone. (See § 21005.)

C. *Failure to Recirculate the Negative Declaration After Adding New Mitigation Conditions.*

Gentry contends that the City improperly added mitigation measures to the proposed negative declaration after its release, without recirculating it.

On March 17, 1992, when the City gave notice of its intent to adopt a negative declaration, the only mitigation measures in the administrative record were those the County had proposed as conditions of approval, numbered 1 through 32. Several of these conditions incorporated conditions that had been proposed in letters from other agencies, by reference.

On May 5, 1992, the City issued a second staff report which included a list of conditions of approval numbered 1 through 128, together with a proposed mitigation monitoring program. The City's list included all the conditions the County had proposed, replacing references to the County with

references to the City as necessary.[17] Where the County had incorporated conditions proposed by other agencies by reference, however, the City added each such condition to its own list verbatim.[18] Thus, many of the City's seemingly new conditions were ones the County had incorporated by reference, and hence were not truly new.

We find that 43 conditions, however, *were* new:

(1) The City substantially modified two of the County's traffic mitigation conditions.

(2) The County had received a letter from the Eastern Municipal Water District commenting extensively on the Project, but had never incorporated these comments into its proposed conditions. The City, by contrast, adopted some of them as its conditions 56 and 57. Also—presumably to save itself the effort of redacting the rest of the water district's lengthy comments—the City added a third, blanket condition requiring McMillin to "comply with any other conditions required by the Water District."

(3) The County's engineering geologist had prepared a soil stability report, but the County had never incorporated his recommendations into its proposed conditions. The City adopted them as an additional six conditions.

(4) The City adopted 21 mitigation conditions from the Adobe I EIR.

(5) The City added two conditions expressly to respond to issues that had been raised at the April 7 public hearing.

(6) The City added one mitigation condition regarding the Stephens' kangaroo rat.

(7) The City added two conditions dealing with landscaping and six conditions dealing with fire hazards, for reasons, and from sources, which we are unable to divine.

Respondents argue that Gentry fails to identify the conditions she claims were improperly added. Of course, it is her contention that the City released only EA No. 34807, and hence that *all* the mitigation conditions, including the County's, were improperly added later. As discussed in part IV.A., *ante*,

---

[17]The City also made other minor changes to the wording of a few of the County's conditions. We consider these changes nonsubstantive and insignificant.

[18]In several instances, the City also redundantly adopted the County's conditions incorporating the letters by reference.

however, we presume that on March 17, 1992, the City duly released all documents comprising a negative declaration, including the County's proposed mitigation conditions. Thus, with regard to conditions released thereafter which merely carried forward the County's conditions, we reject Gentry's contention. With regard to conditions released thereafter which were genuinely new, however, we feel we must reach the merits.

Respondents argue that some of the "new" conditions in reality already applied as a matter of law. For example, some of them required McMillin to comply with specified ordinances, codes, and standards with which it presumably would have had to comply in any event. (See *Leonoff* v. *Monterey County Bd. of Supervisors*, *supra*, 222 Cal.App.3d at p. 1357 [mitigation conditions which merely require compliance with applicable laws need not be circulated for public review].) However, this was not true of all the new conditions.[19]

Respondents also contend that where there is no substantial evidence that the mitigation measures included in a proposed negative declaration when it was released were inadequate, further mitigation measures may be added thereafter, citing *Leonoff* v. *Monterey County Bd. of Supervisors*, *supra*, 222 Cal.App.3d 1337. In *Leonoff*, a county planning department adopted a negative declaration; when its action was appealed to the county's board of supervisors, the board added three new mitigation measures, then denied the appeal. (*Id.*, at pp. 1344, 1356.) Opponents of the project argued that the additional mitigation measures required the negative declaration to be recirculated for public review. (*Id.*, at p. 1356.)

As the court analyzed the issue: "CEQA contemplates public review of mitigation measures proposed in a negative declaration to reduce potentially significant effects. [Citations.] CEQA does not require mitigation of insignificant effects. By interpolation, it would appear that if the initial public review demonstrates the need for further mitigation to reduce significant effects, any new mitigation proposal should be subject to further public review. [Citations.] On the other hand, if the initial public review demonstrates the initial mitigation will adequately reduce potential effects to insignificance, imposition of additional mitigation does not require further public review." (222 Cal.App.3d at pp. 1356-1357.) It found "no substantial evidence that the initial mitigating measures were inadequate to reduce any

---

[19]Respondents also make the following contentions, which we reject as not supported by the record: (1) that condition 49.a "is not substantially different from [condition 21.j] imposed by the County"; (2) that condition 110 merely "restate[s] the requirements of the [F]lood [C]ontrol and [Water] [C]onservation [D]istrict"; and that condition 128 merely "reflects a modification to the Project design made prior to December 1990."

impacts to insignificance. Thus, if County imposed further conditions in an excess of caution, they were not subject to public review." (222 Cal.App.3d at p. 1357; accord, *Citizen Action to Serve All Students* v. *Thornley* (1990) 222 Cal.App.3d 748, 759 [272 Cal.Rptr. 83] [mitigation measures did not have to be incorporated into project prior to public release of negative declaration where measures did not relate to significant environmental effects].)

We also note that in *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency, supra,* 188 Cal.App.3d 249, the court held that CEQA simply did not require recirculation of "*additional* mitigation measures made in *response* to comments by those who oppose the project," at least where the additional measures did not amount to "a fundamental reorganization of the negative declaration." (*Id.,* at p. 263.) It explained that "[t]o allow the public review period to proceed *ad nauseam* would only serve to arm persons dead set against a project with a paralyzing weapon—hired experts who can always 'discover' flaws in mitigation measures. . . ." (*Ibid.*)[20]

*Long Beach* is not applicable here, however, because the bulk of the City's new conditions appear to have been added by City staff acting on their own, rather than in response to public comment on the Project. The *Long Beach* court's concern lest a lead agency's very responsiveness to public comment unduly prolong the process is inapplicable here. Moreover, the addition of 43 new conditions would seem, on its face, to be a sufficiently substantial reorganization of a negative declaration to call for a renewed public comment period, provided at least some of the new conditions were imposed to mitigate significant environmental effects.

Respondents therefore argue that some of the new conditions were imposed for reasons other than to mitigate a significant environmental impact, so that CEQA does not apply to them. They also argue, pursuant to *Leonoff,* that there was no substantial evidence that the original conditions were inadequate to mitigate any significant environmental effect; hence the new conditions were added merely in "an excess of caution," and did not have to be publicly circulated.

 We concur with *Leonoff* that conditions which do not address an otherwise significant environmental effect need not be publicly circulated.

---

[20]Leading commentators have criticized *Long Beach* as inconsistent with the statutory requirement that mitigation measures be released to the public for review (§ 21080, subd. (c)(2); Guidelines, §§ 15070, subd. (b)(1), 15071, subd. (e)). (1 Kostka & Zischke, *supra,* § 7.19, at p. 344; Remy, *supra,* at pp. 116, 122.)

We therefore approach this issue much as we do the issue of whether there was substantial evidence to support a fair argument that the Project would have significant environmental effects. Both issues require us to summarize the evidence in the record regarding the Project's potential environmental effects. If there was no substantial evidence before the City to support a fair argument that the Project—as mitigated by the County's conditions, which we assume the City released along with its negative declaration—would have a particular environmental effect, then the City was free to add mitigation conditions addressing that effect without recirculating the proposed negative declaration.

Gentry contends there is substantial evidence in the record to support a fair argument that the Project may have significant environmental effects on: (1) wildlife, (2) traffic, (3) recreational resources, (4) historical resources, (5) groundwater, flooding and erosion, and (6) the physical arrangement of the community. Many of the added conditions do not seem, even arguably, to relate to any of these environmental effects.[21] We will discuss the other added conditions, which do relate, at least arguably, to one or more of the environmental effects identified by Gentry, when we discuss the evidence as to each such effect in parts VI.A., VI.B., and VI.C., *post*.

### D. *Deferred Mitigation.*

Gentry contends that some conditions improperly deferred the determination of appropriate mitigation into the future. "A negative declaration requiring formulation of mitigation measures at a future time violates the rule that members of the public and other agencies must be given an opportunity to review mitigation measures before a negative declaration is approved." (1 Kostka & Zischke, *supra*, § 6.72, at p. 310; see also Remy, *supra*, at pp. 113-114.)

The leading case on deferred mitigation is *Sundstrom v. County of Mendocino, supra*, 202 Cal.App.3d 296. There a county adopted a negative declaration including mitigation conditions which required the applicant to perform two studies. One, a hydrological study, would have had to show no adverse environmental effects. The other, a soil study, was expected to propose mitigation measures; the negative declaration purported to incorporate such measures by reference, in advance, as mitigation conditions. (*Id.*, at p. 306.) The court declared "[t]his procedure . . . contrary to law," as well as "counter to that policy of CEQA which requires environmental review at the earliest feasible stage in the planning process." (*Id.*, at p. 307.)

---

[21]In this group, we include conditions 30.a, 30.b, 30.c, 52, 56-58, 100-103, 105-106, 108, 114-115, 117-118, 123, and 127-129.

Other mitigation conditions in *Sundstrom,* however, required that plans for compliance with air and water quality standards and for sludge disposal be approved by various public agencies. (202 Cal.App.3d at p. 308.) The court noted that such "[a] condition requiring compliance with environmental regulations is a common and reasonable mitigating measure." (*Ibid.*) "In the case of the conditions regarding air and water quality standards, the County possessed 'meaningful information' reasonably justifying an expectation of compliance. [Citation.] Since compliance would indeed avoid significant environmental effects, the conditions were proper." (*Id.,* at pp. 308-309.)

In the case of the sludge disposal condition, on the other hand, the court found the county had no reason to expect compliance, as there was no suitable sludge disposal site. (202 Cal.App.3d at p. 309.) Because it also found substantial evidence for a fair argument that sludge generation was a significant environmental effect, it held that the negative declaration was improperly adopted in reliance on this condition. (*Id.,* at pp. 308-311; see also *Oro Fino Gold Mining Corp.* v. *County of El Dorado* (1990) 225 Cal.App.3d 872, 884-885 [274 Cal.Rptr. 720] [negative declaration improperly adopted in reliance on mitigation measures calling for future reclamation, erosion, dust, and fire plans].)

*Sundstrom,* however, was distinguished in *Sacramento Old City Assn.* v. *City Council* (1991) 229 Cal.App.3d 1011 [280 Cal.Rptr. 478]. There a city certified an EIR which required traffic and parking effects to be mitigated by preparation of a transportation management plan; the EIR "recommended" seven potential mitigation measures to be "considered" as part of the plan. (*Id.,* at pp. 1020-1023.) Opponents argued that this constituted impermissible deferred mitigation, citing *Sundstrom.* (*Id.,* at pp. 1023, 1026-1027.)

The court upheld the challenged mitigation condition because the city had recognized the significance of the traffic and parking effects, had committed itself to mitigating their impact, and had adequately discussed possible mitigation alternatives. (229 Cal.App.3d at pp. 1023, 1026-1027.) " '[F]or kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process . . . , the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated.' " (*Id.,* at pp. 1028-1029, quoting Remy (5th ed. 1991) at pp. 200-201; see also *Rio Vista Farm Bureau Center* v. *County of Solano* (1992) 5 Cal.App.4th 351, 376-377 [7 Cal.Rptr.2d 307] [county, by adopting

siting criteria for future projects, made firm commitment to mitigate significant impacts].)

The court distinguished *Sundstrom*, first, because *Sundstrom* involved a negative declaration, rather than an EIR, and second, because in *Sundstrom*, the lead agency did not consider *any* mitigation measures, but rather left the formulation of a mitigation plan up to the applicant. (229 Cal.App.3d at p. 1028.)

Gentry challenges the following conditions as impermissible deferred mitigation measures: 5-6, 16.e, 17.i, 24.c, 24.g, 24.h, 26.c, 26.d, 34-35, 41, 49.a, 67-69, 75, 83-84, 89, 121, and 126.

As to conditions 5-6, 41, 67-69, 83-84, and 121, the argument seems simply inapposite. For example, we perceive no futurity or deferral in condition 84, which merely requires McMillin to have a recorded easement for any off-site drainage structures. Conditions 5 and 41 require McMillin to submit soils reports; condition 6 requires it to submit a grading plan. Unlike the conditions requiring reports in *Sundstrom*, these conditions do not require that the reports contain any specified findings, or that McMillin comply with the reports' recommendations. It would appear that the reports are for the City's information only.

Conditions 16.e, 24.g, 26.c, 34-35, 49.a, and 126 provide for various City departments to direct or approve McMillin's performance of specified mitigation measures. For example, condition 34 provides that McMillin "shall protect downstream properties from damages caused by alteration of the drainage patterns . . . . Protection shall be provided by constructing adequate drainage facilities including enlarging existing facilities and/or by securing a drainage easement. . . . The Protection shall be as approved by the Engineering Department." These conditions meet the requirements of *Sacramento*, in that the City recognized the significance of the potential environmental effects, committed itself to mitigating their impact, and articulated specific performance criteria.

Condition 24.c provides that if the Project is phased, McMillin must submit an overall grading plan, which must be approved by the City Planning Director. Similarly, condition 75 requires McMillin to submit improvement plans, grading plans, and a final map, which must be approved by the County Flood Control and Water Conservation District. These plans and maps were subject to a host of specific performance criteria imposed by various ordinances, codes, and standards, as well as other mitigation conditions. The City's mitigation monitoring program committed it to monitoring

McMillin's compliance with these criteria. Thus, we believe these conditions, too, were of the type approved in *Sacramento*. (See 1 Kostka & Zischke, *supra*, § 6.72, at p. 311 [condition requiring applicant to avoid erosion and prevent siltation by developing "erosion control plan subject to review and approval by City staff" avoids improperly deferred mitigation].)

Conditions 17.i, 24.g, 26.c, and 26.d state that future federal or state (or, in one instance, local) gnatcatcher habitat conservation plans may be substituted for particular provisions of the gnatcatcher monitoring program, provided the City determines that the habitat conservation plans afford equivalent mitigation.[22] Yet again, these conditions commit the City to mitigating the impact of a recognized potential environmental effect and articulate specific performance criteria, and thus meet the requirements of *Sacramento*. Moreover, these conditions are analogous to the conditions upheld in *Sundstrom*, which required the applicant to comply with the environmental requirements of other agencies. (202 Cal.App.3d at pp. 308-309.)

This leaves just one of the conditions which Gentry is challenging: condition 24.h, which requires McMillin to comply with any existing ordinance protecting the Stephens' kangaroo rat. However, it also provides that the City may request McMillin to obtain a biological report regarding the Stephens' kangaroo rat; in that event, McMillin must comply with any recommendations in the report. Condition 24.h is on all fours with the condition in *Sundstrom* which required the applicant to comply with any recommendations of a report that had yet to be performed. It improperly defers the formulation of mitigation.

As discussed in part IV.C., *ante*, CEQA requires public review of proposed conditions only if those conditions are necessary to mitigate potentially significant environmental effects. Thus, if there is no substantial evidence that the mitigation measures in a proposed negative declaration released to the public are inadequate, new mitigation measures may be added without public review. (*Leonoff* v. *Monterey County Bd. of Supervisors*, *supra*, 222 Cal.App.3d at p. 1356.) Arguably, a condition could validly allow for deferred mitigation, provided other mitigation measures were clearly adequate to reduce the project's potential environmental impacts to insignificance. (See *Sundstrom* v. *County of Mendocino*, *supra*, 202 Cal.App.3d at pp. 308-311 [because there was substantial evidence that project would generate environmentally significant sludge, condition providing for future approval of sludge disposal plan was improper].)

---

[22]These conditions were poorly drafted. Most glaringly, a sentence appears to have been omitted from conditions 24.g and 26.c. Nevertheless, we believe that when these conditions are construed together and in light of the reasons for their adoption, they are reasonably clear.

As we will discuss in part VI.A., *post*, however, there was substantial evidence to support a fair argument that the Project, even as mitigated by the County, would have a significant impact on the Stephens' kangaroo rat. Accordingly, any proposed mitigation for impacts on the Stephens' kangaroo rat had to be made available for public review; it could not be left to be formulated in the future. By adopting the mitigated negative declaration in reliance on condition 24.h, the City abused its discretion. Because we hold in part VI.A., *post*, that reversal is required based on substantial evidence to support a fair argument that the Project would have significant environmental effects, we need not decide whether this abuse of discretion was prejudicial.

E. *Failure to Exercise Independent Judgment.*

Gentry contends that the City's proposed negative declaration was prepared by the County, and therefore did not reflect the City's independent judgment. A negative declaration must be prepared "directly by, or under contract to, a public agency." (§ 21082.1, subd. (a).) Any draft negative declaration circulated by the lead agency must reflect its independent judgment. (§ 21082.1, subd. (c)(2).) Moreover, the final negative declaration must reflect the lead agency's independent judgment (§ 21082.1, subd. (c)(1); see also Guidelines, § 15025, subd. (b)), and the lead agency must make a finding that it does so. (§ 21082.1, subd. (c)(3).)

In *Friends of La Vina* v. *County of Los Angeles* (1991) 232 Cal.App.3d 1446 [284 Cal.Rptr. 171], disapproved on other grounds in *Western States Petroleum Assn.* v. *Superior Court, supra,* 9 Cal.4th at pages 570, footnote 2, 576, footnote 6, a county directed the applicant to hire a private consultant to prepare necessary EIR documentation. The consultant prepared an initial version of a draft EIR. The consultant revised his version several times in response to the county's review and comments. The county then released the draft EIR. (232 Cal.App.3d at pp. 1450-1451.) The court held this procedure did not violate CEQA: "[A]n agency may comply with CEQA by adopting EIR materials drafted by the applicant's consultant, so long as the agency independently reviews, evaluates, and exercises judgment over that documentation and the issues it raises and addresses." (*Id.,* at p. 1452.)

Here, the proposed negative declaration was prepared by the County—at the time, the lead agency—rather than by the developer or a hired consultant, as in *Friends of La Vina.* Thereafter, when the City was incorporated, it took over as lead agency. We have not been referred to any statutory or case authority on the effect of such a change in the identity of the lead agency, nor has our own research revealed any. We note, however, that where two

public agencies *simultaneously* have a substantial claim to be lead agency for a project, they may enter into an agreement designating one of them the lead agency; such an agreement may also "provide for cooperative efforts . . . by contract, joint exercise of powers, or similar devices." (Guidelines, § 15051, subd. (d).) This strongly suggests that where two public agencies *successively* are lead agency for a project, they could likewise engage in "cooperative efforts," provided each agency exercises an independent judgment on the matters which actually come before it for decision.

It is undisputed that the County exercised its independent judgment in releasing a proposed negative declaration, in proposing mitigation conditions, and in holding public hearings. The City then rereleased the County's proposed negative declaration on March 17, 1992. It explained its decision to do so in its first staff report. The staff report discussed the history of the Project, including the history of its consideration by the County. The staff report discussed the issues that had been raised in the County's public hearings, but concluded that "[e]ach of these issues has been resolved through the Conditions of Approval, as written by County staff and amended by City staff . . . ." This staff report shows that the City did review, analyze, and exercise independent judgment with respect to the proposed negative declaration. The proposed negative declaration adequately reflected the City's independent judgment.

Gentry appears to contend that it is not enough that the proposed negative declaration *in fact* reflected the City's independent judgment, as shown by the subsequently issued staff report; rather, the proposed negative declaration had to show *on its face* that it reflected the City's independent judgment, to assure the public that the document was current and consistent with City policies. We are aware of no authority for such a requirement. We believe the fact that the City released the proposed negative declaration as its own impliedly represented to all concerned that it did reflect the City's independent judgment. If necessary, the truth of that implied representation can be tested in court, based on the entire administrative record.

Gentry also contends, in her reply brief, that the City failed to make the finding required by section 21082.1, subdivision (c)(3) that the *final* negative declaration reflected its independent judgment. Because she raised this contention for the first time in her reply brief, respondents have been deprived of an opportunity to respond to it. We therefore need not consider this contention, and we do not. (*Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 [142 Cal.Rptr. 429, 572 P.2d 43]; see generally, 9 Witkin, Cal. Procedure (3d ed. 1985) § 496 at pp. 484-485.)

## V.

### SUBSTANTIVE COMPLIANCE WITH CEQA: THE STANDARD OF REVIEW

Gentry contends that the City's determination to adopt a mitigated negative declaration must be reviewed using the "fair argument" test, and thus the trial court erred when it applied a substantial evidence standard of review.

Respondents, however, contend that a substantial evidence standard of review applies whenever the lead agency is relying on a previously certified EIR, citing *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency, supra,* 188 Cal.App.3d 249. Respondents also suggest that a substantial evidence standard of review should apply whenever the question before the lead agency is whether to prepare an EIR on a residential development project that is consistent with a general plan for which an EIR has been prepared, under section 21083.3. The trial court accepted respondents' position; it found that the City did proceed pursuant to section 21083.3 and that the *Long Beach* standard of review did apply.

We disagree. We find that the City did not rely on any previous EIR and did not proceed under section 21083.3, and hence the fair argument test applies. Accordingly, we need not consider Gentry's additional contentions that (1) the negative declaration failed to identify the previous EIR's on which the City was relying and (2) the City did not follow the procedures required under section 21083.3.

### A. *The "Fair Argument" Test.*

Under section 21151, a local agency (and, under § 21100, a state agency) ordinarily must prepare an EIR on any project which "*may* have a significant effect on the environment." (Former § 21100, italics added, amended eff. Jan. 1, 1994, now § 21100, subd. (a); former § 21151, italics added, amended eff. Jan. 1, 1994, now § 21151, subd. (a); see also §§ 21080, subd. (d), 21082.2, subd. (a); Guidelines, § 15064, subd. (a)(1).) Conversely, an agency may adopt a negative declaration only if there is no substantial evidence that the project "*may* have a significant effect on the environment." (§ 21080, subd. (c)(1) and (2), italics added; see also Guidelines, § 15070.)

A trial court therefore reviews an agency's decision to adopt a negative declaration using the "fair argument" test. Under this test, the agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a proposed project may have a significant

effect on the environment. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 6 Cal.4th at p. 1123; *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at pp. 75, 82-86; *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d at pp. 172-173; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1001-1003 [165 Cal.Rptr. 514]; Guidelines, § 15064, subd. (g); see generally, 1 Kostka & Zischke, *supra,* § 6.29, pp. 272-274; Remy, *supra,* at pp. 99-106.) "If such evidence is found, it cannot be overcome by substantial evidence to the contrary." (*Leonoff* v. *Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1348; accord, *Citizen Action to Serve All Students* v. *Thornley, supra,* 222 Cal.App.3d at p. 754; *Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d at p. 1002; see generally, 1 Kostka & Zischke, *supra,* § 6.29, at p. 273; Remy, *supra,* at p. 100.)

"The lead agency's determination is thus largely legal rather than factual; it does not resolve conflicts in the evidence but determines only whether substantial evidence exists in the record to support the prescribed fair argument." (1 Kostka & Zischke, *supra,* § 6.29, at pp. 273-274.) The court's "function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made." (*Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d at p. 1002.)

The lead agency, however, has some discretion to determine whether particular evidence is "substantial." (*Newberry Springs Water Assn.* v. *County of San Bernardino* (1984) 150 Cal.App.3d 740, 750 [198 Cal.Rptr. 100]; *Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles* (1982) 134 Cal.App.3d 491, 504 [184 Cal.Rptr. 664]; see generally, 1 Kostka & Zischke, *supra,* §§ 6.29-6.34, pp. 272-282.) "The courts should not substitute [their] own credibility determinations for those of the public agency." (*Leonoff* v. *Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1349; accord, *Newberry Springs Water Assn.* v. *County of San Bernardino, supra,* 150 Cal.App.3d at p. 750.) They must give the agency "the benefit of a doubt on any legitimate, disputed issues of credibility." (*Quail Botanical Gardens Foundation, Inc.* v. *City of Encinitas, supra,* 29 Cal.App.4th at p. 1603.)

B. *The Decision to Prepare an SEIR Under Section 21166.*

"[T]he 'fair argument' test was derived from an interpretation of . . . section 21151 itself. For this reason, the 'fair argument' test has been applied *only* to the decision whether to prepare an original EIR or a negative declaration." (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 6 Cal.4th at p. 1135.)

For example, under section 21166, once an EIR has been prepared, an SEIR may be required if substantial changes in either the project or the surrounding circumstances require major revisions of the EIR. (See also Guidelines, §§ 15162, 15163.) "Section 21166 is intended to provide a balance against the burdens created by the environmental review process and to accord a reasonable measure of finality and certainty to the results achieved." (*Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065, 1074 [230 Cal.Rptr. 413].) It "comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process." (185 Cal.App.3d at p. 1073.)

For these reasons, the "fair argument" test does not apply to the decision on whether to prepare an SEIR. Rather, a trial court reviews the decision on whether to prepare an SEIR using a "substantial evidence" standard of review. Under this standard, the agency's decision must be upheld if it is supported by substantial evidence in the record as a whole. (*Benton* v. *Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1481-1482 [277 Cal.Rptr. 481]; *Bowman* v. *City of Petaluma, supra,* 185 Cal.App.3d at pp. 1072-1075; 1 Kostka & Zischke, *supra,* § 19.51, pp. 755-756; Remy, *supra,* at pp. 105, 264-269.)

Although "[c]ase law does not establish a clear-cut test for determining when a new application should be treated as an application for a change in a previously approved project as opposed to a new project" (1 Kostka & Zischke, *supra,* § 19.30, at p. 735), it offers pertinent guidance.

In *Benton* v. *Board of Supervisors, supra,* 226 Cal.App.3d 1467 (cited hereafter as *Benton*), the court relied on how the lead agency itself had treated the new application. There, a county approved an application for a use permit authorizing construction of a winery, and adopted a mitigated negative declaration. Later, the applicant applied for a new use permit authorizing construction of the winery in modified form and on a different site. The county approved the second application, and again adopted a mitigated negative declaration. (226 Cal.App.3d at p. 1473.)

The court held that the second negative declaration was not a determination under section 21151 that no EIR was required, but rather was, in substance, a determination under section 21166 that no SEIR was required. (226 Cal.App.3d at pp. 1475-1476.) Accordingly, it applied the substantial evidence standard of review. (*Id.,* at pp. 1481-1482.) It held that what was critical was that ". . . the county, by its actions, had treated the new use permit as a modification of the earlier project, rather than a new project for

purposes of CEQA." (*Id.*, at p. 1476, citing *Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1542-1548 [252 Cal.Rptr. 79].) The court noted that the county "consistently treated the new application as if it were a request for modification of the already permitted project." (226 Cal.App.3d at p. 1476.) For example, the county had referred to the project as the relocation of the original winery, and had limited its review of the project to the difference in impact between the new winery and the old. (*Id.*, at pp. 1476-1477; see also 1 Kostka & Zischke, *supra*, § 19.30, pp. 734-736 [agency may have discretion to treat new application as modification of earlier project or as new project].)

As in *Benton*, the court in *Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577 [284 Cal.Rptr. 498] (cited hereafter as *Burbank-Glendale-Pasadena*) looked to how the lead agency itself had treated the new activity. In 1985, the appellant, an airport authority, had approved the extension of an existing taxiway, and adopted a negative declaration. In 1989, it passed resolution No. 224, proposing to condemn property belonging to one Hensler to be used to complete the taxiway project. The airport authority never considered whether the condemnation required further compliance with CEQA. (233 Cal.App.3d at pp. 583-585.)

The court held that the taxiway and the condemnation were separate projects, and that the airport authority should have considered the environmental consequences of the condemnation. (233 Cal.App.3d at pp. 592-594.) The airport authority argued that the condemnation was merely a change in the original taxiway project, but the court refused to consider this contention: "Because there is no evidence that the Authority, in adopting Resolution No. 224, ever conducted a threshold initial study under CEQA, or considered the issue of whether an additional environmental document needed to be prepared due to subsequent changes in the project (see Guidelines, § 15162), these issues are ones, among others raised by appellant, which should be addressed by the Authority in the first instance—i.e. before granting any approval of a project subject to CEQA—rather than by the trial court or this court. [Citations.] If this court were to address the merits of such issues, we would be engaging in postapproval environmental review; CEQA would become nothing more than *post hoc* rationalizations to support actions already taken. [Citation.]" (*Id.*, at p. 594.)

Most recently, in *Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307 [8 Cal.Rptr.2d 473] (cited hereafter as *Sierra Club*), the court relied on the fact that the new application was inconsistent with the original project. There, a county adopted a plan specifying which land could be used for mining aggregate, and prescribing methods for reclamation of agricultural

soil during mining operations, and certified an EIR. Subsequently, a mining company, Syar, asked the county to amend the plan by redesignating certain land as suitable for mining and by authorizing a different reclamation method. The county approved Syar's request; it found that all the resulting environmental effects had been considered in the prior EIR, and it therefore adopted a negative declaration. The trial court, however, found that substantial evidence supported a fair argument that the amendments would have substantial environmental effects, and ruled that the county should have prepared a new EIR. (*Id.*, at pp. 1313-1315.)

On appeal, Syar argued because the county had already adopted an EIR, the substantial evidence standard of review applied. (6 Cal.App.4th at p. 1316.) The court, however, noted that even where a previous EIR has been certified, a new, tiered EIR must be prepared if a new project "may" have a significant effect on the environment. (*Id.*, at p. 1319, citing § 21094, subd. (c).) It concluded that the decision to prepare a tiered EIR under section 21094 was governed by the same fair argument test as the decision to prepare an initial EIR under section 21151, and not by the substantial evidence standard which governed the decision to prepare an SEIR under section 21166. (6 Cal.App.4th at pp. 1319-1320.)

Section 21166 and the substantial evidence standard, it held, apply only "when the question is whether more than one EIR must be prepared for what is essentially the same project." (6 Cal.App.4th at p. 1320.) The court found that the requested amendments were not part of the original project because "Syar sought permission to engage in terrace mining on land which was specifically designated in the Plan as an agricultural resource. . . . Under these circumstances, the evidence does not support a determination that Syar's proposed site-specific project was either the same as or within the scope of the project, program, or plan described in the program EIR." (*Id.*, at pp. 1320-1321.)

We note a certain tension between this holding of *Sierra Club* and the terms of section 21166, which applies even where "[*s*]*ubstantial changes are proposed in the project which will require *major revisions* of the environmental impact report." (§ 21166, subd. (a), italics added.) Nevertheless, it would seem that the fact that a new application and an earlier project *are* consistent should weigh in favor of treating the new application as a mere change to the original project under section 21166.

Respondents rely instead on *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency, supra*, 188 Cal.App.3d 249. There, a city redevelopment agency adopted a redevelopment plan for its downtown area, and

certified an EIR. Later, it determined to construct an office, retail and entertainment complex in the area. In connection with the proposed complex, it adopted a mitigated negative declaration. (*Id.*, at pp. 254-256.)

The court held that the issue before the agency was whether to adopt an SEIR under section 21166, and therefore the substantial evidence standard of review applied. (188 Cal.App.3d at pp. 264-266.) It also observed that "redevelopment projects receive special status under the law. 'For all purposes of [CEQA] all public and private activities or undertakings pursuant to or in furtherance of a redevelopment plan shall be deemed a single project.' (Pub. Resources Code, § 21090.) This rule is presently restated in a guideline which provides that 'An EIR on a redevelopment plan shall be treated as a program EIR with no subsequent EIRs required for individual components of the redevelopment plan unless a subsequent EIR . . . would be required by [Guidelines] Section 15162 . . . .' (Cal. Admin. Code, tit. 14, § 15180(b).)" (*Id.*, at pp. 265-266.) Thus, it held that "where a redevelopment EIR already has been certified and a negative declaration has been prepared in lieu of a subsequent supplemental or site specific EIR, the test is whether the record as a whole contains substantial evidence to support the agency's determination that a particular project will not have a significant adverse effect on the environment." (*Id.*, at p. 266.)

*Long Beach* therefore turned on an express statutory direction, applicable solely to redevelopment projects, to treat both the original project and the new application as a single project. It does not support respondents' contention that *any* time an agency relies on a prior EIR, the substantial evidence standard of review applies. (See *Sierra Club, supra,* 6 Cal.App.4th at p. 1321 [rejecting contention that substantial evidence standard of review applies to tiering; limiting *Long Beach* to redevelopment plans].) Here, we are not dealing with a redevelopment plan, and no other statute of which we are aware required the City to treat both the Community Plan and the Project as a single "project" for purposes of CEQA. Thus, we concur with Gentry that *Long Beach* is not controlling.

Here, the Community Plan expressly encompassed future development consistent with its provisions, and the Plan EIR analyzed the environmental effects of such future developments. Moreover, it appears that the Project was consistent with the Community Plan; Gentry does not argue otherwise. Thus, arguably the City could have treated the Project as a change to the Community Plan, and could have limited its environmental review of the Project to the question of whether to require an SEIR under section 21166.

The fact is, however, that the City never purported to consider whether to require an SEIR. The Community Plan is not even in the administrative

record. The Plan EIR is in the record, but City staff used it only as a source of mitigation conditions for the new project. The City made no findings with respect to whether the Project constituted a substantial change to the Community Plan, or whether the change was such as to require an SEIR. Rather, it found that the Project's potential environmental effects had been mitigated, and that the Project was "not likely to cause substantial environmental damage." These very findings show that the City framed the issue in terms of whether to prepare an EIR for the Project under section 21151. Under *Benton* and *Burbank-Glendale-Pasadena*, the City is bound by its election not to proceed under section 21166.

C. *The Determination of Whether a Project Is Partially Exempt From CEQA Under Section 21083.3.*

Section 21083.3 governs CEQA review of a residential development project that is consistent with a general plan for which an EIR has been certified. (Former § 21083.3, subd. (a), amended eff. Jan. 1, 1993, now § 21083.3, subd. (b); see Guidelines, § 15183, subd. (b).) The application of CEQA to such a project "shall be limited to effects on the environment which are peculiar to the parcel or to the project and which were not addressed as significant effects in the prior [EIR]." (Former § 21083.3, subd. (a), amended eff. Jan. 1, 1993, now § 21083.3, subd. (b); see Guidelines, § 15183, subd. (a).)

An environmental effect is not "peculiar" to a project that is consistent with a general plan "if uniformly applied development policies or standards have been previously adopted by the city or county, with a finding based upon substantial evidence . . . that the development policies or standards will substantially mitigate that environmental effect when applied to future projects." (Former § 21083.3, subd. (a), amended eff. Jan. 1, 1993, now § 21083.3, subd. (d); see Guidelines, § 15183, subd. (d).) However, "[a]n environmental effect shall not be considered peculiar to the project . . . solely because no uniformly applied development policy or standard is applicable to it." (Guidelines, § 15183, subd. (e).)

Section 21083.3 also requires that all public agencies with authority to do so must undertake, or require the undertaking of, any feasible mitigation measures specified in the plan EIR that are relevant to a significant environmental effect of the project. If they fail to do so, section 21083.3 does not apply to review of that effect. (Former § 21083.3, subd. (a), amended eff. Jan. 1, 1993, now § 21083.3, subd. (c); see Guidelines, § 15183, subd. (c)(1).) Section 21083.3 therefore requires the lead agency to "make a finding, at a public hearing, as to whether those mitigation measures will be

undertaken." (Former § 21083.3, subd. (a), amended eff. Jan. 1, 1993, now § 21083.3, subd. (c); see Guidelines, § 15183, subd. (c)(2).)

The results of section 21083.3 are much like those of tiering. If the new project has peculiar effects which were not addressed in the prior EIR, it may be appropriate to use tiering to streamline review of those effects. (See Guidelines, § 15152 and discussion.)[23] Nevertheless, section 21083.3 is not, strictly speaking, a tiering provision; rather, it provides a statutory exemption from CEQA. (1 Kostka & Zischke, *supra*, § 11.34, pp. 452-453; see former § 21083.3, subd. (a), amended eff. Jan. 1, 1993, now § 21083.3, subd. (e).)

 We assume—because Gentry does not contend otherwise—that the Project was a "residential development project"; that the Community Plan, as an integral part of the County's General Plan, was a "general plan"; and that the Project was "consistent" with the Community Plan, for which an EIR had been certified, all within the meaning of section 21083.3. We also assume, without deciding, that a substantial evidence standard of review would apply to the adoption of a negative declaration under section 21083.3.[24]

---

[23]Respondents rely solely on section 21083.3, on the theory that it entitles them to a deferential substantial evidence standard of review. They expressly disclaim any reliance on tiering, which would require us to apply the stricter "fair argument" standard of review. (*Sierra Club, supra*, 6 Cal.App.4th at pp. 1319-1320.)

It would seem that the County and the City *could* have used tiering, and considered only those potential environmental effects of the Project which were not examined in the Plan EIR. (§§ 21068.5, 21093, 21094; Guidelines, §§ 15152, subd. (b), 15385; see also Guidelines, § 15063, subds. (b)(1)(C), (c)(3)(D), Register 94, No. 34, operative Sept. 19, 1994.) The fact is, however, that they did not (with the exception of the Project's traffic effects, which, as we will discuss in part VI.B.1., *post*, the County did compare to the traffic effects examined in the Plan EIR). Thus, the negative declaration did not state that tiering was being used, did not specifically refer to the Plan EIR, and did not state where a copy of the Plan EIR could be examined, all of which tiering would have required. (§ 21094, subd. (e); Guidelines, § 15152, subd. (e).)

[24]We have held that a substantial evidence standard of review applies to an agency's factual finding that a statutory exemption applies. (*Western Mun. Water Dist.* v. *Superior Court* (1986) 187 Cal.App.3d 1104, 1113 [232 Cal.Rptr. 359], disapproved on other grounds in *Western States Petroleum Assn.* v. *Superior Court, supra*, 9 Cal.4th at pp. 570, fn. 2, 576, fn. 6; see 1 Kostka & Zischke, *supra*, § 5.99, pp. 244-245.)

Most statutory exemptions, however, operate regardless of whether the project will have effects on the environment. (E.g., §§ 21080, subd. (b)(1)-(b)(8) & (b)(10)-(b)(13), 21080.01-21080.03, 21080.05, 21080.07.) Thus, "[w]hen reviewing a statutory exemption, the nature and extent of the project's environmental impacts are ordinarily irrelevant." (1 Kostka & Zischke, *supra*, § 5.99, at p. 244.) Therefore, we have at least suggested that where a statutory exemption *does* depend on whether the project will have significant environmental effects (as does section 21083.3), the fair argument standard should govern review of an agency determination that the statutory exemption applies. (*Western Mun. Water Dist.* v.

Again, however, it does not appear that either the County or the City actually proceeded pursuant to section 21083.3. Respondents do not cite any reference to section 21083.3 in the administrative record, and our review of the record has not revealed any. The record likewise does not reflect that the County or the City made any effort to determine whether any environmental effects of the Project were "peculiar," and if so, whether they were addressed in the Plan EIR.

To the contrary, it affirmatively appears that both the County and the City processed the Project "from scratch." That is, they performed an initial study to determine whether the Project as proposed would have significant environmental effects, and if so, whether those environmental effects could be mitigated such that a negative declaration would be appropriate. When respondents' counsel appeared at public hearings to defend the Project's compliance with CEQA, he did not claim that section 21083.3 applied, but rather that all of the Project's potential environmental effects had been appropriately mitigated.

In an appropriate case, undisputed facts in the record might demonstrate that a statutory exemption applies as a matter of law. (See *Napa Valley Wine Train, Inc.* v. *Public Utilities Com.* (1990) 50 Cal.3d 370, 377-383 [267 Cal.Rptr. 569, 787 P.2d 976] [holding that statutory exemption applied; reversing agency determination to the contrary].) This cannot be the case, however, if the environmental review process failed to develop the pertinent facts because the agency was operating under an incorrect legal standard. (See *East Peninsula Ed. Council, Inc.* v. *Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 174 [258 Cal.Rptr. 147].) Here, because the County and the City never purported to apply section 21083.3 and instead subjected the Project to plenary environmental review, we lack an adequate record from which to determine, in hindsight, whether section 21083.3 applied.

For example, section 21083.3 does not apply to any "significant effect which the project will have on the environment" unless "all public agencies with authority to mitigate the significant effect[] . . . undertake or require the undertaking of any feasible mitigation measures specified in the prior environmental impact report" relevant to that effect. (Former § 21083.3, subd. (a), amended eff. Jan. 1, 1993, now § 21083.3, subd. (c); see Guidelines, § 15183, subd. (c)(1).) The lead agency must "make a finding, at a public hearing, as to whether those mitigation measures will be undertaken."

---

*Superior Court, supra,* 187 Cal.App.3d at p. 1113; but see 1 Kostka & Zischke, *supra,* § 11.34, at p. 452 [substantial evidence standard should govern review of agency determination that section 21083.3 applies].)

(Former § 21083.3, subd. (a), amended eff. Jan. 1, 1993, now § 21083.3, subd. (c); see Guidelines, § 15183, subd. (c)(2).) Here, however, the County and the City did not purport to be proceeding under section 21083.3, and thus neither of them ever made such a finding.

Respondents argue that the City *did* make the necessary finding. It found that the Project complied with all "applicable" laws. Respondents argue that this implied that the Project complied with the General Plan, the Community Plan, and the Plan EIR. However, this was not the equivalent of a finding that the mitigation measures in the County's Plan EIR were actually being undertaken. This is all the more true because the City had taken jurisdiction over the Project site; the County's General Plan and Community Plan were no longer "applicable."

The trial court therefore erred when it found that the City proceeded in accordance with section 21083.3. We are not bound, however, by its additional finding that if section 21083.3 did not apply, then a negative declaration was inappropriate. We therefore turn to the propriety of the mitigated negative declaration, which we measure using the fair argument test.

VI.

### EVIDENCE THAT THE PROJECT MAY HAVE SIGNIFICANT ENVIRONMENTAL EFFECTS

Gentry contends there is substantial evidence to support a fair argument that the Project may have significant environmental effects on: (1) wildlife, (2) traffic, (3) recreational resources, (4) historical resources, (5) the physical arrangement of the community, and (6) groundwater, flooding and erosion. We consider each of these potential effects in turn.

A. *Effects on Wildlife.*

A lead agency must find that a project will have a significant effect on the environment, and therefore must prepare an EIR, where "[t]he project has the potential to . . . substantially reduce the habitat of a fish or wildlife species, cause a fish or wildlife population to drop below self-sustaining levels, threaten to eliminate a plant or animal community, [or] reduce the number or restrict the range of a rare or endangered plant or animal . . . ." (Guidelines, § 15065, subd. (a); see also Guidelines, appen. G, subds. (c), (d), (t).)

According to the initial biological report, no California gnatcatchers or Stephens' kangaroo rats were observed at the Project site.[25] However, burrows and droppings indicated that Stephens' kangaroo rats were present. The report concluded that the Project "would result in the taking of any Stephens' kangaroo rats occupying the site and would render the habitat unsuitable for reoccupancy by the species." It found that the impact on the Stephens' kangaroo rat could not be mitigated on-site, but could and would be mitigated off-site by compliance with County Ordinance No. 663 (subsequently amended and renumbered as County Ordinance No. 663.5, now see County Ordinance No. 663.6). This ordinance would require McMillin to pay mitigation fees, which the County was to use to develop and implement a habitation conservation program for the Stephens' kangaroo rat.

The County, pursuant to a joint powers agreement with the cities of Hemet, Lake Elsinore, Moreno Valley, Perris, and Riverside, did in fact adopt a short-term Stephens' kangaroo rat habitat conservation plan, which was approved by the United States Fish and Wildlife Service in August 1990. (55 Fed.Reg. 33777 (Aug. 17, 1990).)

A second biological report focused on the California gnatcatcher. It reported 13 California gnatcatcher sightings on or in the vicinity of the Project site. It concluded that the Project as proposed would "cause the loss and fragmentation of California gnatcatcher habitat . . . as well as the loss of California gnatcatchers." It found that the impact on the California gnatcatcher could be mitigated by preserving 35 acres as open space (which McMillin had offered to do), and by carrying out a gnatcatcher "monitoring program." The monitoring program required McMillin to surround the open space preserve with a cat-proof fence, and to conduct a five-year gnatcatcher population survey.

Based on the biological reports, EA No. 34807 found that the Project as proposed would have effects on wildlife, including "[c]hange in the diversity of species, or overall number of any species of animals," "[r]eduction of the numbers of any unique, rare, threatened or endangered species of animals," and "[d]eterioration of existing . . . wildlife habitat." It also found, however, that these effects could be mitigated as proposed in the reports.

The County's conditions of approval, together with an amendment to McMillin's tentative subdivision map, provided for all the mitigation conditions recommended by the biological reports: the payment of kangaroo rat

---

[25]The Stephens' kangaroo rat was officially listed as endangered. (50 C.F.R. § 17.11 (1994); 53 Fed.Reg. 38465 (Sept. 30, 1988).) At the time, the California gnatcatcher was a candidate for listing as threatened or endangered. On March 30, 1993, the coastal California gnatcatcher—the particular subspecies of the California gnatcatcher found in Riverside County—was officially listed as threatened. (50 C.F.R. § 17.11 (1994); 58 Fed.Reg. 16742 (Mar. 30, 1993).)

mitigation fees in compliance with County Ordinance No. 663, the open space gnatcatcher preserve, and the gnatcatcher monitoring program.

In the proceedings before both the County and the City, Gentry's group challenged both the adequacy of the biological reports and the sufficiency of the County's wildlife mitigation conditions. Gentry's group submitted two letters from Dr. John T. Rotenberry, a biologist from the University of California at Riverside, who agreed that the proposed mitigation conditions were inadequate.

The City's mitigation conditions included all of the County's proposed wildlife mitigation conditions; however, they also provided that if a local, state, or federal gnatcatcher habitat conservation plan were adopted, compliance with some (in the case of a local plan) or all (in the case of a state or federal plan) of the gnatcatcher fence and population survey conditions would not be required.

The City also added a new mitigation condition which required McMillin to comply with existing City ordinances regarding the Stephens' kangaroo rat, and, "[i]f deemed necessary by the Planning Director," to obtain a further biological report on the site with regard to the Stephens' kangaroo rat and to comply with any recommendations in the new report.

We find no substantial evidence to support a fair argument that the City's mitigation measures for the California gnatcatcher were inadequate. The biological reports had concluded that the open space gnatcatcher preserve, together with the gnatcatcher monitoring program, was adequate mitigation. Although Gentry's group disagreed with this conclusion, none of its criticisms were supported by substantial evidence. Gentry's group claimed that its views were supported by various authorities, such as the United States Fish and Wildlife Service and various ornithological papers, but never produced any evidence to substantiate its claims.[26] Dr. Rotenberry's views were based on unspecified "material" Gentry had sent him; he, too, disagreed with the biological reports, but offered no substantial contradictory evidence.

Gentry also contends that the material submitted by her group constituted substantial evidence that the County's mitigation measures for the Stephens' kangaroo rat were inadequate. We disagree. Although Dr. Rotenberry opined that the Project would eliminate any Stephens' kangaroo rats on or near the

---

[26]Gentry cites papers by J. Michael Scott et al. and by Patrick Mock et al. as substantial evidence that the Project would have a significant effect on wildlife. However, these works are not in the record.

site, this opinion merely restated the finding of the biological report that no on-site mitigation could be provided. It did not impeach the further finding of the biological report that off-site mitigation, consisting of the payment of mitigation fees and the eventual implementation of a local habitat conservation plan, would be adequate mitigation.

Gentry contends that the kangaroo rat mitigation measures were uncertain because it was unclear whether the City had an ordinance like former County Ordinance No. 663 or 663.5, which required payment of kangaroo rat mitigation fees to be used to develop and implement a habitat conservation plan. The record, however, shows that the City adopted former County Ordinance No. 663.5 shortly after its incorporation.

Gentry further contends that the kangaroo rat mitigation measures were inadequate because the City, unlike the County, had not actually established a habitat conservation program. This argument has merit. As we discussed in part IV.D., *ante*, a mitigation condition that depends on the future formulation of a mitigation plan may be valid, provided the lead agency recognizes the significance of the potential environmental effect, commits itself to mitigating its impact, and articulates specific performance criteria for the future mitigation. (*Sacramento Old City Assn.* v. *City Council*, *supra*, 229 Cal.App.3d at pp. 1028-1029.) Here, however, despite the City's adoption of former County Ordinance No. 663.5, the City had not become a party to the County's approved habitat conservation plan, and had not committed itself to do so. The City's mitigation monitoring program did not so much as mention the Stephens' kangaroo rat. The biological report constituted substantial evidence that the payment of fees, in the absence of a habitat conservation plan, would be inadequate mitigation. Thus, the record supports a fair argument that the Project, even as mitigated, would have a substantial impact on the Stephens' kangaroo rat.

As we discussed in part III.A., *ante*, the initial study offered no evidence to back up its conclusion that the Project would have no cumulative impacts, and we are unable to identify any such evidence in the administrative record. As a result, the facts in the record give rise to a fair argument that the Project's incremental impacts on the Stephens' kangaroo rat would be cumulatively considerable when considered against the backdrop of other projects in the area.

As discussed in part IV.C., *ante*, if there was substantial evidence to support a fair argument that the Project would have a significant effect on the Stephens' kangaroo rat, then the City could not adopt new mitigation conditions aimed at this effect without recirculating its proposed negative

declaration. Nevertheless, the City added mitigation condition 24.h, relating to effects on the Stephens' kangaroo rat, without recirculating. In so doing, it abused its discretion. Because we hold that the City's adoption of the negative declaration in the face of substantial evidence to support a fair argument that the Project would have significant environmental effects requires reversal, we need not decide whether this additional abuse of discretion was prejudicial.

The City also modified the County's conditions regarding the California gnatcatcher by reserving the right to substitute a federal, state or local habitat conservation plan in place of the proposed gnatcatcher monitoring program, without recirculating the proposed negative declaration. As there was no substantial evidence to support a fair argument that the Project would have a significant effect on the California gnatcatcher, the City was free to adopt new mitigation conditions aimed at this effect without recirculating its proposed negative declaration.

We conclude that the City abused its discretion in adopting a mitigated negative declaration for the Project in the face of substantial evidence supporting a fair argument that the Project, even as mitigated, would have significant adverse environmental effects on the Stephens' kangaroo rat.

B. *Effects on Los Alamos Road.*

The Community Plan noted that Los Alamos Road was an existing "high use" road, and provided for it to become a "major" road. At full build-out pursuant to the Community Plan, traffic on Los Alamos Road in the vicinity of the Project was to go from 1,000 average daily trips (ADT's) to 24,000; traffic on Los Alamos Road as a whole was to go from 4,100 ADT's to 38,600. The Community Plan called for road widening and other roadway improvements to mitigate its anticipated traffic impacts.

The County's initial study relied on a traffic impact report on the Project. The report characterized Los Alamos Road as a two-lane, undivided road which was then carrying 2,200 ADT's in the neighborhood of the Project. It found that the Project would generate approximately 2,300 additional ADT's, of which about 70 percent, or 1,610, would involve Los Alamos Road.

The traffic report also found that once the Project and other planned projects in the vicinity were built, the level of service[27] at three nearby intersections would go down; however—provided improvements were made to one of the intersections as a mitigation measure—intersection levels of service would not go below those deemed acceptable in the General Plan. Even if the area were fully built out pursuant to the General Plan (including all roadway improvements provided for in the General Plan), intersection levels of service would not go below those deemed acceptable in the General Plan. In addition to intersection improvements, the report recommended several other mitigation measures. It concluded that the Project would add traffic, but that "[g]iven the proposed mitigation measures," it would "meet county requirements for the resulting levels of service."

Based on the traffic impact report, EA No. 34807 found that the Project as proposed would have effects on traffic circulation, including "[g]eneration of substantial additional vehicular movement," a "[s]ubstantial impact upon existing transportation systems," and an "[i]ncrease in traffic hazards . . . ." It also found, however, that the Project would result in levels of service consistent with the Community Plan; "all other traffic impacts" would be mitigated "by compliance with requirements of the Transportation Department."

EA No. 34807 also found that the Project, even without mitigation, would have no impact on existing recreational opportunities or on historic resources. It did not expressly consider whether the Project would impact the physical arrangement of any established community. It did find, however, that the Project, even without mitigation, would not alter "present patterns of circulation or movement of people and/or goods."

Thereafter, the County Transportation Department proposed a list of conditions. These included the intersection improvements and other mitigation conditions recommended by the traffic report, plus several new conditions. One of the County's conditions required Los Alamos Road to be improved, reconstructed, or resurfaced to a half-width of 38 feet from centerline (i.e., a total width of 76 feet).[28] The County's conditions of approval incorporated these conditions proposed by the transportation department.

---

[27]"Level of service" (or LOS) is based on the ratio of traffic volume to capacity. According to the record, the lowest level of service is "A," representing a volume-to-capacity ratio of between 0.00 and 0.60; the highest is "F," representing a volume-to-capacity ratio of 1.01 or more. (See also *Schaeffer Land Trust* v. *San Jose City Council, supra,* 215 Cal.App.3d at p. 623.)

[28]In light of this condition, we cannot credit respondents' assertion that "the Project does not require the widening of Los Alamos Road." Moreover, when the City took jurisdiction of the Project, it added a new condition requiring "Los Alamos Road along the property

The City's second staff report noted that issues had been raised regarding Los Alamos Road. The City's mitigation conditions included all of the County's proposed traffic mitigation conditions. However, the City also added a new mitigation condition which required McMillin to design Los Alamos Road to "reflect the City Engineer's determination of appropriate roadway design to preserve rural character by providing recreational paths, trails, trees or other public use design elements," and to submit its landscaping plans for Los Alamos Road to the City Engineer for "review . . . for consistency with rural character and use by the public."

### 1. *Effects on Traffic.*

Gentry's contention that EA No. 34807 failed to consider cumulative traffic effects is factually unfounded. A cumulative effects analysis requires consideration of "reasonably foreseeable probable future projects, if any." (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d at p. 168.) The traffic impact report upon which EA No. 34807 was based, however, specifically compared existing traffic to the traffic that would result not only from the Project, but also from other projects planned in the vicinity. It also compared existing traffic to the traffic that would result from full buildout of the area pursuant to the Community Plan. This necessarily included "even projects anticipated beyond the near future." (*Ibid.*)

Gentry's further contention that EA No. 34807 and the traffic report upon which it was based considered only impacts on urban roads and ignored impacts on the "rural road system" is likewise factually unfounded. She indicates that by "urban" roads, she means those one mile or more away from the Project. The traffic report, however, considered not only the Project's impact on existing intersections (which appear to be a mile or more from the Project, giving rise to Gentry's contention), but also on existing roads in the immediate vicinity of the Project. We find no substantial evidence that the traffic report failed to consider any relevant road.

Finally, Gentry contends that there was evidence that the Project as mitigated would still have significant adverse effects on the rural road system. Under the Guidelines, "[a] project will normally have a significant effect on the environment if it will . . . [¶] [c]ause an increase in traffic which is substantial in relation to the existing traffic load and capacity of the street system." (Guidelines, appen. G, subd. (*l*).)

The traffic report showed that the Project would degrade levels of service at three nearby intersections, and would increase traffic on Los Alamos Road

---

boundary [to] be constructed to its General Plan half width." The record indicates that McMillin and Gentry's group agreed on a specific four-lane design for the widened roadway.

by at least 73 percent. Gentry claims there is evidence that the Project would increase traffic on Los Alamos Road by more than 100 percent, which she contends is, in itself, a significant environmental effect. We believe this figure is, if anything, too low; there was evidence that the increase could be as great as 129 percent.[29]

These were matters of fair argument, supported by substantial evidence in the record; indeed, respondents do not contend otherwise. Their central contention is that the Project's effects on traffic were consistent with the Community Plan, and therefore had already been considered in the Plan EIR. As we have held in parts V.B. and V.C., *ante*, however, the City did not take advantage of any of the "piggy-backing" provisions of CEQA—an SEIR, tiering, or section 21083.3—that would have permitted it to rely on the Plan EIR. Moreover, it did not comply with the procedural requirements applicable under either tiering or section 21083.3.

In the absence of some form of "piggy-backing," the Project's effects on traffic could be "significant" even though they were consistent with the Community Plan. "When assessing whether an EIR is required . . . , the local agency is required to compare the newly authorized land use with the actually existing conditions; comparison of potential impacts . . . with potential impacts under the existing general plan is insufficient." (*Christward Ministry* v. *Superior Court*, *supra*, 184 Cal.App.3d at p. 190; accord, *City of Antioch* v. *City Council* (1986) 187 Cal.App.3d 1325, 1332 [232 Cal.Rptr. 507] ["conformity with the general plan for the area . . . does not insulate a project from the EIR requirement, where it may be fairly argued that the project will generate significant environmental effects"]; *City of Carmel-by-the-Sea* v. *Board of Supervisors*, *supra*, 183 Cal.App.3d at pp. 246-247 [effects of rezoning had to be judged against existing conditions, not against conditions permitted under land use plan]; *Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d

---

[29]Gentry calculates as follows: first, for existing traffic volume, in place of the 2,200 ADT's given in the County's traffic report she uses 1,244 ADT's, which she derives from a different traffic report, done in 1992. She points out that the figure in the County's report appears to apply to a different stretch of Los Alamos Road than the one closest to the Project.

Next, for the traffic volume the Project would add, she uses a figure of 1,980 additional ADT's for the Project as a whole, which she purports to derive from the traffic report, then multiplies by 70 percent, the percentage of total trips which the traffic report found would involve Los Alamos Road. She arrives at 1,380 additional ADT's. This is an increase of a little more than 100 percent.

Her figure of 1,244 ADT's for existing traffic volume is fairly arguable from the evidence, as is her figure of 70 percent for trips involving Los Alamos Road. The traffic report, however, found that the Project would generate not 1,980 additional ADT's, but 2,300. When multiplied by 70 percent, this gives 1,610 ADT's on Los Alamos Road, an increase of 129 percent.

350, 354 [182 Cal.Rptr. 317] ["CEQA nowhere calls for evaluation of the impacts of a proposed project on an existing general plan; it concerns itself with the impacts of the project on the environment, defined as the existing physical conditions in the affected area"]; cf. *Benton, supra,* 226 Cal.App.3d at p. 1477, fn. 10 [rule that project's effects must be measured against existing conditions rather than against conditions permitted under existing plans does not apply where issue is whether to prepare an SEIR].) Certainly a project's impacts *may* be significant if they are *greater* than those deemed acceptable in a general plan. (*Oro Fino Gold Mining Corp.* v. *County of El Dorado, supra,* 225 Cal.App.3d at pp. 881-882 [lead agency's finding that project would have significant noise effects was supported by substantial evidence that project would generate more noise than maximum permitted under general plan].) We do not agree, however, that a project's effects *cannot* be significant as long as they are *not* greater than those deemed acceptable in a general plan.

Respondents contend that the City was entitled to evaluate the significance of the Project's traffic impacts against "legislatively adopted standards of service," by which they mean the Community Plan. In support of this proposition, they cite *Citizen Action to Serve All Students* v. *Thornley, supra,* 222 Cal.App.3d 748 and *Schaeffer Land Trust* v. *San Jose City Council, supra,* 215 Cal.App.3d 612. We do not agree, however, that the Community Plan constituted such a "standard of service." In each of the cases upon which respondents rely, the lead agency used predetermined engineering standards to judge the significance of a traffic impact. (*Citizen Action to Serve All Students* v. *Thornley, supra,* 222 Cal.App.3d at p. 756 [10 percent increase in delay at intersection would be significant]; *Schaeffer Land Trust* v. *San Jose City Council, supra,* 215 Cal.App.3d at p. 623 [reduction of level of service below D, or, if existing level of service was E or F, increase in traffic volume of 1 percent or more, would be significant].) The Community Plan, by contrast, did not purport to be a ruler against which the significance of a traffic impact could be measured. To the contrary: it provided for traffic levels which were, as the Plan EIR concluded, both significant and not susceptible to reasonably feasible mitigation.

The traffic report and EA No. 34807, which relied on it, concluded that the traffic impact of the Project, as mitigated, would not be significant because it would be no greater than the impacts already contemplated in the Plan EIR as a result of the Community Plan. This was a non sequitur. This very defect in the initial study, together with the substantial evidence in the record that the Project's traffic impact might be even greater than the initial study found, gives rise to a fair argument that the Project, even as mitigated, would have a significant impact on traffic.

We conclude that the County abused its discretion in adopting a negative declaration for the Project despite the existence in the record of substantial evidence supporting a fair argument that the Project, even as mitigated, would have significant adverse environmental effects on traffic. The City further abused its discretion by adding mitigation conditions 31-32, 122, and 125, to the extent that they related to traffic effects, without recirculating its proposed negative declaration.

### 2. *Effects on Recreational Uses.*

"A project will normally have a significant effect on the environment if it will . . . [¶] [c]onflict with established recreational . . . uses of the area." (Guidelines, appen. G, subd. (w).) EA No. 34807 found that the Project as proposed would not "result in an impact upon the quality or quantity of existing recreational opportunities."

Gentry contends that substantial evidence in the record supports a fair argument that the Project would have a significant adverse impact on established recreational uses. She points to written comments from her group, from other groups and individuals, and by City Councilmembers. We find additional similar comments in the record. Many of these comments dealt with the failure to provide *new* recreational facilities, such as a park, swimming pool, hiking trail or bicycle trail; they did not assert that the Project would conflict with any established recreational use.

One community member asserted that the mitigation condition requiring McMillin to widen Los Alamos Road to 76 feet would prevent continued use of the road for hiking, bicycling and horseback riding. Gentry and others asserted that the projected increase of traffic on Los Alamos Road would interfere with its existing use by pedestrians, hikers, bicyclists, and equestrians. We have previously held, however, that in the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence. (*Newberry Springs Water Assn.* v. *County of San Bernardino, supra,* 150 Cal.App.3d at pp. 748-749 [residents' opinions that 900-cow dairy would bring flies and odor not substantial evidence]; accord, *Leonoff* v. *Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1352 [residents' opinions that traffic conditions near project were dangerous not substantial evidence].)

We find no substantial evidence in the record supporting a fair argument that the Project, either as originally proposed or as mitigated, would have a significant effect on established recreational uses. Moreover, as discussed in

part IV.C., *ante*, because there was no such substantial evidence, the City's addition of mitigation conditions 49.a, 116, and 126, to the extent that they relate to recreational uses, did not require it to recirculate the proposed negative declaration for further public review.

### 3. *Effects on Historic Resources.*

 "A project will normally have a significant effect on the environment if it will . . . [¶] [d]isrupt or adversely affect . . . a property of historic or cultural significance to a community or ethnic or social group." (Guidelines, appen. G, subd. (j).) This guideline "come[s] into play only if a disruption of the physical environment has cultural significance." (*Cathay Mortuary, Inc.* v. *San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 279 [254 Cal.Rptr. 778].)

Gentry contends that substantial evidence in the record supports a fair argument that the Project will adversely affect the historical significance of Los Alamos Road. Gentry's group, along with other interested persons, offered evidence that Los Alamos Road had venerable historical associations; it had been traveled by Native Americans, Mexican vaqueros, pioneers headed west, and farmers on their way to market.[30] This evidence included illustrations of the way in which the layout of Los Alamos Road, and particularly its relationship to such surrounding features as farmhouses, drainage channels, rock outcroppings, trees, and chaparral, preserved historic land use patterns.

In response, the City added a new mitigation condition which required McMillin to design Los Alamos Road to "reflect City Engineer's determination of appropriate roadway design to preserve rural character by providing recreational paths, trails, trees or other public use design elements," and to submit its landscaping plans for Los Alamos Road to the City Engineer for "review . . . for consistency with rural character and use by the public."

We find no substantial evidence that the Project would adversely affect the historical significance of Los Alamos Road. True, the road was to be widened, but it would still follow its historical path. There was no evidence that the required widening would destroy any of the surrounding features, or would impair the historical significance of the road's relationship to them.

We therefore find no substantial evidence in the record to support a fair argument that the Project, either as originally proposed or as mitigated,

---

[30]While the Project was under consideration, efforts were underway to have Los Alamos Road designated a state or local historical resource. (See generally, §§ 5020.1, subd. (k), 5021, 5022.5, 5024.1.) It does not appear, however, that these efforts came to fruition.

would adversely affect any property of historic significance to the community. Moreover, because there was no such substantial evidence, the City's addition of mitigation conditions 49.a and 116, to the extent that they relate to historic resources, did not require it to recirculate the proposed negative declaration for further public review.

### 4. *Effects on the Physical Arrangement of the Community.*

■ "A project will normally have a significant effect on the environment if it will . . . [¶] [d]isrupt or divide the physical arrangement of an established community." (Guidelines, appen. G, subd. (u).) "[T]his guideline was intended to apply to projects, such as highway construction, that would constitute physical barriers dividing a community." (*Cathay Mortuary, Inc.* v. *San Francisco Planning Com., supra,* 207 Cal.App.3d at p. 280.)

Gentry contends that substantial evidence in the record supports a fair argument that the Project will turn Los Alamos Road into a "divisive wedge" between residents on either side of it, and will thereby have a significant adverse impact on community arrangement. She also contends that the Project will disrupt the physical arrangement of the community by transforming its density and design from rural to urban. She relies on comments from her group and comments, as well as petitions, from other community members.

Many of these have little bearing on the issue of whether the project would disrupt the physical arrangement of the community. They include, however, the evidence that the Project would increase traffic on Los Alamos Road by up to 129 percent, together with comments from Gentry to the effect that "[t]he additional traffic and road widening . . . will divide the physical arrangement of our neighborhood." Others commented that the project would result in "division of the neighborhood" because one side of the road would become developed while the other side would remain rural. Gentry also argued that "the proposed setbacks, density, and orientation of the project's lots next to the road" were inconsistent with those of existing residences, and hence would "disrupt the physical arrangement of the community."

There was substantial evidence that the Project would result in the widening of Los Alamos Road and in additional traffic on it. There was not, however, substantial evidence to support a fair argument that these effects on Los Alamos Road would disrupt or divide an existing community. According to a map submitted by Gentry's group, the southeast side of Los Alamos Road was sparsely settled, with about 63 single-family residences in the

vicinity of the Project; the northwest side, with just 14 single-family residences, was barely inhabited at all. There was no evidence that access across Los Alamos Road made, or was necessary to make, the two sides into one community. Gentry's generalized fears and conclusions, as we have held above, did not constitute substantial evidence. Although Gentry offered evidence that excessively wide streets "may" disrupt neighborhoods, there was no evidence that this was in fact the case as to Los Alamos Road. Finally, her claim that lots in the Project would differ in density and design from existing lots was irrelevant to show that the Project would create a physical barrier dividing an existing community.

We find no substantial evidence in the record supporting a fair argument that the Project, either as originally proposed or as mitigated, would have a significant effect on the physical arrangement of an established community.

C. *Effects on Groundwater Recharge, Flooding, and Erosion.*

"A project will normally have a significant effect on the environment if it will . . . [¶] [s]ubstantially degrade water quality; . . . [¶] [c]ontaminate a public water supply; . . . [¶] [s]ubstantially degrade or deplete ground water resources; . . . [¶] [i]nterfere substantially with groundwater recharge; . . . [or] [¶] [c]ause substantial flooding, erosion, or siltation." (Guidelines, appen. G, subds. (f), (g), (h), (i), (q).)

EA No. 34807 found that the Project as proposed would increase water erosion, and would affect floodplains by changing both the "course or direction of water movements" and "absorption rates or the rate and amount of surface runoff." It also found, however, that the Project, even as proposed, would not affect water resources or water quality; specifically, it would not change the quantity of groundwater or cause groundwater contamination. EA No. 34807 concluded that any erosion effects would "be mitigated by following the approved grading plan and meeting the requirements of the grading permit." Similarly, effects on floodplains would be "mitigated through the requirements imposed by [the] Riverside County Flood Control and Conservation District."

Pursuant to EA No. 34807, the County proposed conditions of approval regarding grading, and incorporated by reference conditions of approval regarding drainage proposed by the County Flood Control and Conservation District. The County's grading conditions required McMillin to submit a grading plan in conformity with various codes, ordinances and standards. They also required drainage facilities in conformity with the Uniform Building Code and other specified standards. The County's conditions also incorporated by reference certain conditions proposed by the County Transportation Department dealing with drainage. The County Flood Control and

Conservation District's conditions required certain changes in the Project's drainage design, required drainage to meet specified standards, and required payment of drainage fees.

In the proceedings before the County, Gentry submitted a letter from Professor Gary L. Guymon of the Department of Civil Engineering at the University of California at Irvine. Professor Guymon noted that Gentry had supplied him with several maps and a geology report, and had given him unspecified "information" over the telephone. He then opined, based on the information from Gentry together with his "general knowledge of the area," that the Project would have "little or no impact on . . . groundwater with the possible exception of the area . . . just south of the proposed development . . . . If there were any impacts, they could be mitigated by providing a portable [sc. potable?] supply from the proposed development." Two residents who were dependent on well water were concerned as a result of Professor Guymon's letter, and felt the Project's impact on groundwater recharge would be significant.

At the City's first public hearing on April 7, 1992, a number of people expressed concern that the Project would prevent rain from reaching groundwater, forcing it onto nearby properties instead. A representative of the Murrieta Creek Greenbelt Committee testified that the Project "could" divert as much as 100 acre-feet of water per year from groundwater into streams, causing flooding. The Murrieta Creek Greenbelt Committee and others—particularly residents dependent on well water—were also concerned that any rainwater that did make it into the groundwater might carry pollutants from the Project. The president of the Elsinore-Murrieta-Anza Resource Conservation District testified that existing "urban development" of the area had caused pollution, "high levels of erosion," and silt and sedimentation in Murrieta Creek. He claimed the total effect of all projects planned in the area "could" be a 60 percent increase in runoff.

After the first public hearing, McMillin submitted three new reports to the City. A report on storm water runoff, dated April 22, 1992, found that the Project would redistribute runoff slightly, such that in a 100-year storm, runoff rates at 2 points would increase 5.6 percent and 1.4 percent, respectively, while the runoff rate at a third point would decrease 1.7 percent. The engineer who prepared the report testified that its margin of error was such that these figures represented "essentially no change." An infiltration report, also dated April 22, 1992, found that the Project would *increase* the amount of water entering the soil by 36 percent (due to irrigation). A groundwater impact report, dated April 27, 1992, found that the Project would not pollute

groundwater. Based in part on these reports, the City's second staff report concluded that the Project as it then stood would have no significant impact on runoff or on groundwater quality or quantity.

At the second public hearing, in response to McMillin's reports, it was argued that even if the Project would not pollute groundwater, contaminated runoff from the Project would pollute two surface ponds.

The City's conditions of approval included virtually all of the County's conditions of approval with respect to grading and drainage.[31] The City added two new conditions designed to prevent water erosion on slopes in the Project.[32] It also added a number of conditions drawn from the Adobe I EIR; several of these dealt with grading, drainage, erosion, and groundwater recharge.

Preliminarily, Gentry contends that the three reports McMillin submitted after the first public hearing were untimely. However, as we noted in part III.A., *ante*, defects in an initial study may be cured by information received during the public comment period. (*Leonoff* v. *Monterey County Bd. of Supervisors, supra*, 222 Cal.App.3d at pp. 1347-1348; *Sundstrom* v. *County of Mendocino, supra*, 202 Cal.App.3d at p. 305.) After all, evidence that a project will not have significant environmental effects, regardless of when it is received, is not conclusive; the real issue is whether there is substantial evidence to support a fair argument to the contrary.

 Gentry therefore contends there is substantial evidence to support a fair argument that the Project will have significant effects on groundwater recharge, drainage, and erosion. The letter from Professor Guymon, however, indicated that the Project would *not* affect groundwater, with the "possible exception" of one area. This did not constitute substantial evidence supporting a fair argument that the Project *would* affect groundwater in that area, particularly as Professor Guymon's opinions were not clearly based on an adequate foundation of factual information about the Project. (See *Lucas Valley Homeowners Assn.* v. *County of Marin* (1991) 233 Cal.App.3d 130, 156-157 [284 Cal.Rptr. 427] [real estate agent's opinion that property values would decline 10 percent was "speculative, imprecise . . . , without any

---

[31]The City omitted one of the County's conditions, apparently by accident. This condition required slope setbacks to conform to the Uniform Building Code, which they presumably would have to do even in the absence of such a condition. We therefore do not consider its omission significant.

[32]These had been recommended by the County's engineering geologist. It seems most likely that they were omitted from the County's conditions of approval by accident.

supporting, verifiable data such as comparables," hence not substantial evidence]; see § 21082.2, subd. (c) ["unsubstantiated opinion . . . is not substantial evidence. Substantial evidence shall include . . . expert opinion supported by facts."].) Similarly, no factual foundation was shown for the Murrieta Creek Greenbelt Committee's claim that "[t]he loss of rainfall on this site could amount to over 100[] acre[-]feet a year," or for the claim that the Project would pollute nearby ponds.

The testimony by the president of the Elsinore-Murrieta-Anza Resource Conservation District related exclusively to the effects of other existing and planned projects in the area. No evidence was offered that this Project would have the same or similar effects. (*Newberry Springs Water Assn.* v. *County of San Bernardino*, *supra*, 150 Cal.App.3d at p. 749 [evidence of environmental effects of other dairies not substantial, where no evidence that conditions at project would be similar].) Other residents' unsubstantiated opinions and concerns about the Project's effects on groundwater likewise did not constitute substantial evidence. (*Id.*, at pp. 748-749; accord, *Leonoff* v. *Monterey County Bd. of Supervisors*, *supra*, 222 Cal.App.3d at p. 1352.)

Thus, we find no substantial evidence in the record supporting a fair argument that the Project, as originally mitigated by the County, would have significant effects on erosion, flooding, or on the quantity or quality of groundwater. Moreover, as discussed in part IV.C., *ante*, because there was no such substantial evidence, the City's addition of conditions 50-51, 53-55, 109-113, 119-121, and 124, to the extent that they dealt with erosion, flooding or groundwater, did not require it to recirculate the proposed negative declaration for further public review.

## VII.

### Disposition

The judgment is reversed. The trial court is directed to issue a peremptory writ of mandate, including a mandate that respondent City void its adoption of the negative declaration and void its approval of McMillin's applications for a zoning change and for subdivision map approval for Adobe Springs II. (§ 21168.9, subd. (a)(1).) We remind the trial court of section 21168.9, subdivision (b), which provides: "The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with [CEQA]."

Nothing in this opinion should be taken to mean that the City *must* prepare an EIR for the Project. When the City takes up the matter again, it may consider: whether the Project is a change or modification to either the Plan EIR or the Adobe I EIR, and if so, whether an SEIR is required; whether the Project is partially exempt under section 21083.3; whether to use tiering; and whether to propose a new mitigated negative declaration.

We deem it proper, as most consistent with the interests of justice, that costs on appeal not be awarded to any party. (Cal. Rules of Court, rule 26(a).)

Dabney, Acting P. J., and McKinster, J., concurred.

A petition for a rehearing was denied August 17, 1995, and the petition of both respondents and real party in interest for review by the Supreme Court was denied October 26, 1995.